| | |
|---|---|
| **From:** | JonMarc Weston <drw@westoneyecenter.com> |
| **Sent:** | Thur 11/8/2018 12:56:20 PM (UTC) |
| **To:** | David Littlejohn <davelittlejohn@gmail.com> |
| **Subject:** | Fwd: NDA for Interested Party |
| **Attachment:** | NDNCA - IP General.pdf |
| **Attachment:** | ATT00001.htm |

See below. Let Kent know if you are interested in more info. Jon

Sent from my iPhone

Begin forwarded message:

> **From:** Kent Limson <Kent@tacsis.com>
> **Date:** November 7, 2018 at 7:57:49 PM PST
> **To:** Jon Marc Weston <drw@westoneyecenter.com>
> **Cc:** Christina - Weston <christina.weston@hotmail.com>
> **Subject: NDA for Interested Party**
>
>
> Hi Jon,
> Attached is a standard NDA/Non-Circumvention for Dave, as a part of the
> introduction we would want him to sign so we can freely discuss the terms for the
> deal and persons involved.
>
> -Kent
>
> --
>
>
> **Kent Limson, CPA, MBA**
>
> Principal Strategist
>
> P +1 424 272 5522
> F +1 424 320 6320
> E Kent@TACSIS.com
>
> **Tax | Accounting | Consulting Solutions | Information Systems**
>
> www.TACSIS.com
>
> This message is intended only for the personal and confidential use of the addressee(s) named above. This
> message is privileged and confidential. If the reader of this message is not the intended recipient, you are
> hereby notified that you have received this document in error, and than any review, dissemination, distribution,
> or copying of this message is strictly prohibited. If you have received this in error, please advise the sender by
> immediate reply and delete the original message. Thank you.
>  **Think More, Print Less**

## **NON-DISCLOSURE - NON- CIRCUMVENTION  AGREEMENT**

THIS NONDISCLOSURE AGREEMENT is made and entered into as of the 7th day of November, 2018, by and between _____ ("Interested Party / IP") , and Kent Limson ("KL").

I. **Purpose.** IP and **KL** wish to explore a business opportunity of mutual interest and in connection with this opportunity,  **KL,** on the-one-hand, and IP, on the other hand, may, as a "Disclosing Party"  hereunder disclose to the other as  the "Recipient" hereunder of certain confidential business information which Di  sclosing Party desires Recipient to treat as confidentia l and, not, in any way known o r subsequently discovered, circumvent the Disclosing Party from furthering any  transaction based on the "Confidential Information", as defined below.

II. **Confidential Information.**  "Confidential Information" means any information disclosed by Disclosing Party to R ecipient, either directly or  indirectly in writing, orally or by inspection of tangible obj ects, including without limitat ion, documents, business plans and prospectuses, other  documentation, financial informat ion, marketing plans, customer names, customer lists, o r customer data. Confidential  information may also include information disclosed to  Recipient by third parties. Co nfidential Information shall not, however, include any information which Recipient can estab  lish (i) was publicly known and made generally available  in the public domain prior t o the time of disclosure to Recipient by Disclosing Party;  (ii) becomes publicly known and made generally available after disclosure to Rec ipient by Disclosing Party thr ough no action or inaction of Recipient; (iii) is in the possession of Recipient, without  confidentiality restrictions, at the time of disclosure by Discl osing Party as demonstrated by R ecipient's files and records immediately prior to the time of disclosure; or (iv) is  independently developed by Recipient, with the requisite proof of such development imme  diately provided to the disclosing party, without regard to or use of any Confidential  Information furnished it hereunder.

III.  **Non-Use, Non-Circumvent and Non-Disclosure.** Recipient agrees not to use any Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between Recipient and Disclosing Party without the prior express written consent of the Disclosing Party. Recipient agrees not to disclose any Confidential Information to third parties or to employees of Recipient, except to those employees who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship and Recipient shall have said employees sign a non-use, non-circumvention and non-disclosure agreements in content substantially similar to the provisions hereof. Recipient further acknowledges, understands and agrees  that

Recipient shall not circumvent the Disclosing Party, in any man ner, with regards to any transactions in which the Disclosing Party has any involvement through the use of such provided Confidential Information.

IV. **Maintenance of Confidentiality.** Recipient agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure, unauth orized use, and any circumvention of the Confidentia l Information. Without limiting the foregoing, Recipient shall take at least those measur es that Recipient takes to prot ect its own most highly confidential information and shal l have its employees, if any, who are given access to the Confidential Informa tion pursuant to Section III, hereof, sign a non-use, non-circumvention, and non-disclosur e agreements in content substan tially similar to the provisions hereof, prior to any disclosure of Confidential Info rmation to such employees. Recipient shall not make any copi es of Confidential Information unless the same is approved by the prior express writ ten consent of the Disclosing Party.
Recipient shall reproduce the proprietary rights notices on any such approved copies in the same manner in which such notices were set forth in or on the original. Recipient shall use its best efforts to immediately notify Disclosing Party in the event of any unauthorized use, circumvention and/or disclosure of the Confidential Information.

V. **No Obligation.** Nothing herein shall obligate Disclosing Party or Recipient to proceed or bind the parties in any transaction presently or subsequently between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity, however to the extent any information has been disclosed to either party by the other, this agreement shall inure to the benefit of the disclosing party for the period of time as defined herein.

VI. **No Warranty.** ALL CONFIDNETIAL INFORMATIONS PROVIDED "AS IS°. DISCLOSING PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

VII. **Return of Materials.** All documents and other tangi ble objects containing or representing Confidential Information and all copies thereof wh ich are in the possession of Recipient shall be and shall remain the property of Disclosi ng Party and shall be promptly returned to Disclosing Party, within a reasonable peri od of time, upon request of Disclosing Party. **All written materials prepared by Recipient relating to this Agreement will be held by Recipient and kept confidential and s ubject to the terms of this Agreement, or promptly destroyed at the request o f Disclosing Party (in which case, such destruction will be certified to Dis closing Party in writing).**

VIII. **Court Mandated Disclosure.** **This Agreement shall not apply to disclosure of Confidential Information to any court or other tr ibunal or government agency. However, unless otherwise prohibited by law, Recipient agrees to provide Disclosing Party with prompt notice of any re quest for disclosure so that Disclosing Party may seek a protective order or other**

**Littlejohn Decl. - Exhibit 1**
**Page 3 of 4**

appropriate remedy. In the event that such protective order or other
remedy are not obtained by Disclosing Party, Recipient shall fu    rnish
to the requesting party only th  at portion of the Confidential
Information which Recipient is advised by wr    itten opinion of it s
counsel is legally required.

IX.  <u>No License.</u> Nothing in this Agreement is in tended to grant any right s to
Recipient under any patent, mask work right or copyright, or an y other proprietary
rights derived worldwide of Disclosing Party, nor shall this Agreement grant R ecipient
any rights in or to  Confidential Information except as expressly set forth herein.

X. **<u>Term.</u>** <u>This Agreement shall survive for  a  period  of  36  months  from  the
date hereof</u>.

**XII. <u>Remedies.</u>** Recipient agrees that any viola tion or threatened violation of this
Agreement will cause irreparable injury to Disclosing Party, en titling Disclosing Party to
obtain injunctive relief in addition to all legal remedies.  **The prevaili ng party in any
action or proceeding brought to enforce the provisions of thi s Agreement
shall be entitled to recover its reasonable legal costs and exp  enses,
including reasonable attorney's fees, incurred in such action o  r proceeding.**

**XII. <u>Miscellaneous,</u>**  This Agreement shall bind and inur e to the benefit of the parti es
hereto and their successors and assigns. This Agreement shall b e governed by the
laws of the State of California, without reference to conflict  of laws principles. Thi s
document contains the  entire agreement between the parties with respect to the
subject matter hereof. Any failure to enforce any provision of  this Agreement shall not
constitute a waiver thereof or of any other provision hereof. T his Agreement may not
be amended, nor any  obligation wa ived, except by in writing signed by both parties
hereto.

*Kent Limson*
_____

Kent Lim son                                     _____

                                                 Print Name

<u>November 7th,  2018</u>                         _____

D ate                                            Date

**From:**     Kent Limson <kent@tacsis.com>
**Sent:**     Tue 11/13/2018 9:29:07 PM (UTC)
**To:**       info@littlejohnfs.com
**Cc:**       Christina - Weston <christina.weston@hotmail.com>
**Subject:**  Fwd: NDA

Hi,
Per our conversation below is a link to the NDA, Please have David sign and send back prior to our call tomorrow at 10am. Let me know if there are any questions.

Kent

Sent from my iPhone

Begin forwarded message:


> **From:** Kent Limson <Kent@tacsis.com>
> **Date:** November 12, 2018 at 11:06:59 PM PST
> **To:** Kent Limson <Kent@tacsis.com>
> **Subject: NDA**


https://www.dropbox.com/s/l6tlwnl7ogmefaf/NDNCA%20-%20IP%20General%2011_13_18.pdf?dl=0

--


**Kent Limson, CPA, MBA**

Principal Strategist

P +1 424 272 5522
F +1 424 320 6320
E Kent@TACSIS.com

**Tax | Accounting | Consulting Solutions | Information Systems**

www.TACSIS.com

This message is intended only for the personal and confidential use of the addressee(s) named above. This message is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and than any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this in error, please advise the sender by immediate reply and delete the original message. Thank you.
 **Think More, Print Less**

## NON-DISCLOSURE - NON- CIRCUMVENTION  AGREEMENT

THIS NONDISCLOSURE AGREEMENT is made and entered into as of the 13th day of November, 2018, by and between David Littlejohn ("Interested Party / IP") , and Kent Limson ("KL").

I. **Purpose.** IP and **KL** wish to explore a business opportunity of mutual interest and in connection with this opportunity, **KL,** on the-one-hand, and IP, on the other hand, may, as a "Disclosing Party" hereunder disclose to the other as the "Recipient" hereunder of certain confidential business information which Disclosing Party desires Recipient to treat as confidential and, not, in any way known or subsequently discovered, circumvent the Disclosing Party from furthering any transaction based on the "Confidential Information", as defined below.

II.   **Confidential Information.** "Confidential Information" means any information disclosed by Disclosing Party to Recipient, either directly or indirectly in writing, orally or by inspection of tangible objects, including without limitation, documents, business plans and prospectuses, other documentation, financial information, marketing plans, customer names, customer lists, or customer data. Confidential information may also include information disclosed to Recipient by third parties. Confidential Information shall not, however, include any information which Recipient can establish (i) was publicly known and made generally available in the public domain prior to the time of disclosure to Recipient by Disclosing Party; (ii) becomes publicly known and made generally available after disclosure to Recipient by Disclosing Party through no action or inaction of Recipient; (iii) is in the possession of Recipient, without confidentiality restrictions, at the time of disclosure by Disclosing Party as demonstrated by Recipient's files and records immediately prior to the time of disclosure; or (iv) is independently developed by Recipient, with the requisite proof of such development immediately provided to the disclosing party, without regard to or use of any Confidential Information furnished it hereunder.

III.   **Non-Use, Non-Circumvent and Non-Disclosure.** Recipient agrees not to use any Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between Recipient and Disclosing Party without the prior express written consent of the Disclosing Party. Recipient agrees not to disclose any Confidential Information to third parties or to employees of Recipient, except to those employees who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship and Recipient shall have said employees sign a non-use, non-circumvention and non-disclosure agreements in content substantially similar to the provisions hereof. Recipient further acknowledges, understands and agrees  that

Page  1 of 3

Recipient shall not circumvent the Disclosing Party, in any manner, with regards to any transactions in which the Disclosing Party has any involvement through the use of such provided Confidential Information.

IV. **Maintenance of Confidentiality.** Recipient agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure, unauthorized use, and any circumvention of the Confidential Information. Without limiting the foregoing, Recipient shall take at least those measures that Recipient takes to protect its own most highly confidential information and shall have its employees, if any, who are given access to the Confidential Information pursuant to Section III, hereof, sign a non-use, non-circumvention, and non-disclosure agreements in content substantially similar to the provisions hereof, prior to any disclosure of Confidential Information to such employees. Recipient shall not make any copies of Confidential Information unless the same is approved by the prior express written consent of the Disclosing Party.
Recipient shall reproduce the proprietary rights notices on any such approved copies in the same manner in which such notices were set forth in or on the original. Recipient shall use its best efforts to immediately notify Disclosing Party in the event of any unauthorized use, circumvention and/or disclosure of the Confidential Information.

V. **No Obligation.** Nothing herein shall obligate Disclosing Party or Recipient to proceed or bind the parties in any transaction presently or subsequently between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity, however to the extent any information has been disclosed to either party by the other, this agreement shall inure to the benefit of the disclosing party for the period of time as defined herein.

VI. **No Warranty.** ALL CONFIDNETIAL INFORMATION IS PROVIDED "AS IS°. DISCLOSING PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

VII. **Return of Materials.** All documents and other tangible objects containing or representing Confidential Information and all copies thereof which are in the possession of Recipient shall be and shall remain the property of Disclosing Party and shall be promptly returned to Disclosing Party, within a reasonable period of time, upon request of Disclosing Party. **All written materials prepared by Recipient relating to this Agreement will be held by Recipient and kept confidential and subject to the terms of this Agreement, or promptly destroyed at the request of Disclosing Party (in which case, such destruction will be certified to Disclosing Party in writing).**

VIII. **Court Mandated Disclosure.** This Agreement shall not apply to disclosure of Confidential Information to any court or other tribunal or government agency. However, unless otherwise prohibited by law, Recipient agrees to provide Disclosing Party with prompt notice of any request for disclosure so that Disclosing Party may seek a protective order or other

**Littlejohn Decl. - Exhibit 3**
**Page 2 of 3**

remedy are not obtained by Disclosing Party, Recipient shall furnish
to the requesting party only that portion of the Confidential
Information which Recipient is advised by written opinion of its
counsel is legally required.

IX. <u>No License.</u> Nothing in this Agreement is intended to grant any rights to
Recipient under any patent, mask work right or copyright, or any other proprietary
rights derived worldwide of Disclosing Party, nor shall this Agreement grant Recipient
any rights in or to Confidential Information except as expressly set forth herein.

X. **<u>Term.</u>** This Agreement shall survive for a period of 36 months from the
date hereof.

XII. **<u>Remedies.</u>** Recipient agrees that any violation or threatened violation of this
Agreement will cause irreparable injury to Disclosing Party, entitling Disclosing Party to
obtain injunctive relief in addition to all legal remedies. **The prevailing party in any
action or proceeding brought to enforce the provisions of this Agreement
shall be entitled to recover its reasonable legal costs and expenses,
including reasonable attorney's fees, incurred in such action or proceeding.**

XII. **<u>Miscellaneous.</u>** This Agreement shall bind and inure to the benefit of the parties
hereto and their successors and assigns. This Agreement shall be governed by the
laws of the State of California, without reference to conflict of laws principles. This
document contains the entire agreement between the parties with respect to the
subject matter hereof. Any failure to enforce any provision of this Agreement shall not
constitute a waiver thereof or of any other provision hereof. This Agreement may not
be amended, nor any obligation waived, except by in writing signed by both parties
hereto.

_____
Kent Limson

David Littlejohn
Print Name

November 13th, 2018
Date

November 14, 2018
Date

| | |
|---|---|
| **From:** | Kent Limson <Kent@tacsis.com> |
| **Sent:** | Wed 11/14/2018 10:27:24 PM (UTC) |
| **To:** | Info@littlejohnfs.com |
| **Subject:** | Referral from Weston Family |
| **Attachment:** | NDNCA - IP General-signed.pdf |

Hi David,

Thanks for taking the time to chat with me today about the incredible opportunity I've secured for investors to be part of a historic build in Las Vegas. For the small investment window we have for this project, investors will not only get a secure, healthy return, but also participate in building a non-gaming landmark on the strip. Highlights are below:

- 11% Return on investment secured by financial guarantee bond.
- Bond is secondarily backed by 100% E&O (errors and omissions) Policy.
- Short 1 year investment payback period.
- Multiple investment opportunities available on this project.
- Minimum Investment $200K

About me:

I have 14 years of experience in the financial consulting and accounting industry. As a CPA & MBA, I serve companies in interim CFO and controller capacities. My unique role at these companies positions me to structure investment opportunities that benefit both the borrower and lender. Unlike traditional lending options through financing brokers, the projects I fund are only for businesses that I have current working relationships with and have extensive due diligence on to ensure leading terms and returns are maximized for success.

As an added layer surety, I work only with federally regulated and licensed insurers to bond and guarantee investor money with liquid assets in the unlikely event of non-performance from the borrower. I am the only person that, in addition to the surety bond, requires 100% errors and omissions insurance on each deal to guarantee returns.

If you have investors interested in learning more about the opportunities related to this project, please have them sign the attached NDA and send back to me with their preferred contact information.

Additionally, if your client base is interested in a smaller initial investment opportunity I have limited space in a second project available with a minimum commitment of $200K offering a 10% return for a nine month bonded hold.

--


**Kent Limson, CPA, MBA**

Principal Strategist

P +1 424 272 5522
F +1 424 320 6320
E Kent@TACSIS.com

**Tax | Accounting | Consulting Solutions | Information Systems**

www.TACSIS.com

This message is intended only for the personal and confidential use of the addressee(s) named above. This message is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and than any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this in error, please advise the sender by immediate reply and delete the original message. Thank you.

**Think More, Print Less**

# <u>NON-DISCLOSURE - NON- CIRCUMVENTION   AGREEMENT</u>

THIS NONDISCLOSURE AGREEMENT is made and entered into as of the _____ day of _____, 2018, by and between _____ ("Interested Party / IP") , and Kent Limson ("KL").

I. **<u>Purpose.</u>** IP and **KL** wish to explore a business opportunity of mutual interest and in connection with this opportunity,    **KL,** on the -one-hand, and IP, on the other hand, may, as a "Disclosing Party" hereunder disclose to the o     ther as the "Recipient" hereunder of certain confidential business information which Disclosing Party desires Recipient to treat as confidential and, not, in any way known or subsequently discovered, circumvent the Disclosing Party from furthering any tran     saction based on the "Confidential Information", as defined     below.

II. **<u>Confidential Information.</u>**    "Confidential Information" means any informatio   n disclosed by Disclosing Party to Recipient, either directly or indirectly in writing, orally or by inspection of   tangible objects, including without limitation, documents, business plans and prospectuses, other documentation, financial information, marketing plans, customer names, customer lists, or customer data. Confidential information may      also include information   disclosed to Recipient by third parties. Confidential Information shall not, however, include any information which Recipient can      establish (i) was publicly known and made generally available in the public domain prior to the time of disclosure to Recipient by Disclosing Party;    (ii) becomes publicly known and made generally available after disclosure to Recipient by Disclosing Party through no action or inact      ion of Recipient; (iii) is in the possession of Recipient, without confidentiality restrictions, at the time of disclosure by Disclosing Party as demonstrated by Recipient's files and records immediately prior to the time of disclosure; or (iv) is independ      ently developed by Recipient, with the requisite proof of such development immediately provided to the disclosing party, without regard to or use of any Confidential Information furnished it hereunder.

III.   **<u>Non-Use, Non-Circumvent and Non-Disclosure</u>**. Recipient agrees not to use any Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between Recipient and Disclosing Party without the prior express written consent of the Disclosing Party. Recipient agrees not to disclose any Confidential Information to third parties or to employees of Recipient, except to those employees who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship and Recipient shall have said employees sign a non-use, non-circumvention and non-disclosure agreements in content substantially similar to the provisions hereof. Recipient further acknowledges, understands and agrees  that

Recipient shall not circumvent the Disclosing Party, in any manner, with regards to any transactions in which the Disclosing Party has any involvement through the use of such provided Confidential Information.

IV. **Maintenance of Confidentiality.** Recipient agrees that it shall take all reasonabl e measures to protect the secrecy of and avoid disclosure, unauthorized use, and any circumvention of the Confidential Information. Without limiting the foregoing, Recipient shall take at least those measure s that Recipient takes to protect its own most highly confidential information and shall have its employees, if any, who are given access to the Confidential Information pursuant to Section    III, hereof, sign a non -use, non-circumvention, and non -disclosur e agreements in content substantially similar to the provisions hereof, prior to any disclosure of Confidential Information to such employees. Recipient shall not make any copies of Confidential Information unless the same is approved by the prior express   written consent of the Disclosing    Party.
Recipient shall reproduce the proprietary rights notices on any such approved copies in the same manner in which such notices were set forth in or on the original. Recipient shall use its best efforts to immediately notify Disclosing Party in the event of any unauthorized use, circumvention and/or disclosure of the Confidential Information.

V. **No Obligation.** Nothing herein shall obligate Disclosing Party or Recipient to proceed or bind the parties in any transaction presently or subsequently between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity, however to the extent any information has been disclosed to either party by the other, this agreement shall inure to the benefit of the disclosing party for the period of time as defined herein.

VI.    **No Warranty .** ALL CONFIDNETIAL INFORMATION PROVIDE "AS IS°. DISCLOSING PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

VII. **Return of Materials.** All documents and other tangible objects containing or representing Confidential Information and all copies thereof which are in the possession of Recipient shall be and shall remain the property of Disclosing Party and shall be promptly returned to Disclosing Party, within a reasonable period of time, upon request of Disclosing Party. **All written materials prep ared by Recipient relating to this Agreement will be held by Recipient and kept confidential and subject to the terms of this Agreement, or promptly destroyed at the request of Disclosing Party (in which case, such destruction will be certified to Disclosi ng Party in writing).**

VIII. **Court Mandated Disclosure.** **This Agreement shall not apply to disclosure of Confidential Information to any court or other tribunal or government agency. However, unless otherwise prohibited by law, Recipient agrees to provide Disclosing Party with prompt notice of any request for disclosure so that Disclosing Party may seek a protective order or other**

**Littlejohn Decl. - Exhibit 4**
**Page 4 of 5**

**appropriate remedy. In the event that such protective order or other remedy are not obtained by Disclosing Party, Recipient shall furnish to the requesting party only that portion of the Confidential Information which Recipient is advised by written opinion of its counsel is legally required.**

IX. <u>No License.</u> Nothing in this A greement is intended to grant any rights to Recipient under any patent, mask work right or copyright, or any other proprietary rights derived worldwide of Disclosing Party, nor shall this Agreement grant Recipient any rights in or to Confidential Information except as expressly set forth herein.

X. **Term.** <u>This Agreement shall survive for a period of 36 months from the date hereof</u>.

**XII. <u>Remedies.</u>** Recipient agrees that any violation or threatened violation of this Agreement will cause irreparabl e injury to Disclosing Party, entitling Disclosing Party to obtain injunctive relief in addition to all legal remedies. **The prevailing party in any action or proceeding brought to enforce the provisions of this Agreement shall be entitled to recover its re asonable legal costs and expenses, including reasonable attorney's fees, incurred in such action or proceeding.**

**XII. <u>Miscellaneous</u> .** This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns. This Agreement shall be governed by the laws of the State of California, without reference to conflict of laws principles. This document contains the entire agreement between the parties with respect to the subject matter hereof. Any failure to enforce any provision of t his Agreement shall not constitute a waiver thereof or of any other provision hereof. This Agreement may not be amended, nor any obligation waived, except by in writing signed by both parties hereto.

Kent Limson

_____
Print Name

<u>November 13   th,  2018</u>
Date

_____
Date

| | |
|---|---|
| **From:** | Kent Limson <Kent@tacsis.com> |
| **Sent:** | Mon 11/19/2018 11:17:38 PM (UTC) |
| **To:** | David Littlejohn <david@littlejohnfs.com> |
| **Subject:** | All Net Project Deal Update. |
| **Attachment:** | All Net Loan Calc FS.xlsx |

Hi David,
I wanted to give you an update on the All Net Arena project deal. After running the numbers the total cash needed to finalize the deal after bonding costs and fees is $1,079,200. I have attached the calculations for your review. Please let me know if you have any questions about the calculations for commitment level for your client. Summary of the loan vs cash out is as follows:

Total Loaned: $1,100,202
Total Cash Wired on Closing: $$1,079,200

Total Repayment Amount to Lender: $1,221,224


Next Steps:

1. I will draft our project offering to the borrower and will send to them for review and signature.

2. I need the address of the Machado Trust to add to the financial guarantee bond documents as I will have the bond for this tranche of the project secure and payable directly to your client as an added level of surety.

3. I will send you wire instructions to move client funds into our escrow account.

4. Once we receive the executed contract, I will send to you for signature as a representative for the trust.

5. Once I have received the signed and notarized financial loan guarantee bond I will release funds to the appropriate agents and accounts.

6. I will provide you with a copy of all signed and executed paperwork.

Please let me know if you have any questions. Please note that I will be traveling overseas for the next two weeks but will be available by text and e-mail most expediently. I will be working to close this and other deals while traveling. I have my team here in the US who will handle and finalize escrow and document signatures who may reach out as needed.

Michelle Marciso - Escrow
Susan Jensen Martz - Broker

I can take calls based on hour shift (Barcelona) as needed as well.

--

**Kent Limson, CPA, MBA**

Principal Strategist

P +1 424 272 5522
F +1 424 320 6320
E Kent@TACSIS.com

**Tax | Accounting | Consulting Solutions | Information Systems**

www.TACSIS.com

This message is intended only for the personal and confidential use of the addressee(s) named above. This message is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and than any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this in error, please advise the sender by immediate reply and delete the original message. Thank you.

 **Think More, Print Less**

**All Net Deal (Bonded Cash Flow)**

| | | | Example return | | |
|---|---|---|---|---|---|
| Term | 12 | Months | | | |
| Loan Rate | 11% | | **Example return** | | |
| Bond rate | 7.50% | | Investment Amount | $ | 1,000,000 |
| Fees | 1% | | Percentage of capital | | 91% |
| Total COC | 19.5% | | Return less Capital | | 110,000 |
| | | | Holding period ROI | | 11% |
| Loan Needed | $ 1,015,000 | | APR | | 11% |
| Interest | $ 121,022 | | | | |

| | | | | Interest Payments | | |
|---|---|---|---|---|---|---|
| **Lending Costs** | | | December | $ | 10,085 | 1 |
| Bond Cost | $ | 85,202 | January | $ | 10,085 | 2 |
| Legal | $ | 5,000 | February | $ | 10,085 | 3 |
| Closing Cost | $ | 5,000 Escrow | March | $ | 10,085 | 4 |
| Fee 1% | $ | 11,002 | April | $ | 10,085 | 5 |
| Total Lending Costs | | 106,204 | May | $ | 10,085 | 6 |
| | | | June | $ | 10,085 | 7 |
| | | | July | $ | 10,085 | 8 |
| | | | August | $ | 10,085 | 9 |
| Total borrowed | 1,100,202 | 1,100,202 | September | $ | 10,085 | 10 |
| Net to Borrower | **1,079,200** | *Before Bond Cost | October | $ | 10,085 | 11 |
| Total Pay back | **1,221,224** | | November | $ | 10,085 | 12 |
| | | | | $ | 121,022 | |
| **Cash to Borrower** | $ **993,998** | | Plus Principle Payment | $ | 1,100,202 | |
| (After Bond) | $ (0) Bond Exposure | | | $ | 1,221,224 | |

| | |
|---|---|
| **From:** | Kent Limson <Kent@tacsis.com> |
| **Sent:** | Tue 11/27/2018 7:01:42 PM (UTC) |
| **To:** | David Littlejohn <david@littlejohnfs.com> |
| **Cc:** | Sue Jensen Martz <sue@rivieramortgagegroup.com>, Michelle Marsico <Michelle@villageviewescrow.com> |
| **Subject:** | All Net LLC Copy of Bond and COI |
| **Attachment:** | AGS Surety Guarantee Document.pdf |
| **Attachment:** | Kent.AGS Assurety Cert (1).pdf |

Hi David,

Per our discussion please find attached for your records a copy of the financial guarantee surety bond which has been issued in the name of the Trust along with a certificate of insurance for the errors and omissions policy with $4M in coverage limit which will additionally cover this bond. I will follow up under separate cover a copy of the executed agreement for your records as well.

You should have received the go ahead from Michelle regarding the wire instructions. Please go head and wire the total of $1,100,202 today with the wire instructions you discussed with Michelle so we can finalize our end of the completed contract. Once initiated please let me know so I can properly update the borrower on timing.

Please let Michelle, Sue or myself know if you have any questions.

-Kent

--


**Kent Limson, CPA, MBA**

Principal Strategist

P +1 424 272 5522
F +1 424 320 6320
E Kent@TACSIS.com

**Tax | Accounting | Consulting Solutions | Information Systems**

www.TACSIS.com

This message is intended only for the personal and confidential use of the addressee(s) named above. This message is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and than any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this in error, please advise the sender by immediate reply and delete the original message. Thank you.

**Think More, Print Less**

Guarantee No. <u>ANLLC-182111-002</u>

## FINANCIAL LOAN GUARANTEE

     This financial loan guarantee (this "Loan Guarantee") is among AGS Assurety LLC., Timothy J Arellano, Individual Surety (collectively, and with Timothy J. Arellano acting as the Individual Surety, "AGS") as Individual Surety and, together with All Net LLC (either "AN" or the "Principal") and memorializes that the Individual Surety are held and firmly bound unto Tacsis LLC C/O The Carole Machado Revocable Living Trust 01/18/2017 (Restated 02/27/2017) (the "Obligee"), in the assured amount of One Million One Hundred Thirty-Six Thousand Twenty-Two Dollars ($1,136,022.00 USD), to which AGS conditionally bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

     **WHEREAS** this Loan Guarantee is related and for that certain loan contract agreement No.712366 by and between Principal and Obligee dated on or about the same date hereof for the original principal amount of One million Fifteen Thousand US Dollars ($1,015,000.00) (the "Loan Contract").

     **NOW, THEREFORE,** Upon the consideration hereby AGS acknowledges receipt thereof, the following terms shall govern this Loan Guarantee.

     **1.  General Condition.**  The condition of this obligation is such that if Principal shall promptly and faithfully perform and comply with the terms and conditions of the Loan Contract and satisfaction of the requirements thereof; and the Individual Surety shall jointly and severally indemnify the Obligee against all losses and liabilities including, but, not limited to any wrongdoing, material fraud, misconduct, want of care or skill, default or failure of performance on the part of any party to the Loan Contract or this Loan Guarantee, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

     **2.  Binding Guarantee.**  AGS jointly and severally bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee for the performance of the Loan Contract, which are incorporated herein by reference for all purposes hereof.

     **3.  Guarantee of Loan Contract.**  AGS, acting in its capacity as Individual Surety, for value received, hereby stipulates and agrees that no change or changes, extension of time or extensions of time, alteration or alterations or addition or additions to the terms of the Loan Contract shall in any wise affect its obligations on this Loan Guarantee, but it does not hereby waive notice of any such change or changes, extension of time or extensions of time, alteration or alterations or addition or additions to the terms of the Loan Contract.

     **4.  Notice of Default and AGS Performance.**  If pursuant to the Loan Contract's documents, in the event Principal shall be declared in default, by written notice to AGS, acting in its capacity as Guarantor, shall remedy the default or defaults at the discretion of the Individual Surety only by promptly, but not later than Forty-five (45) business days after AGS receives written notice of any default under the Loan Contract agreement from the Obligee, to make payment to the Obligee under this Guarantee., acting in its capacity as Individual Surety, shall not assert solvency of any other guarantor as justification for its failure to promptly remedy the default or defaults by making payment solely at the discretion of the Individual Surety. The Obligee's claim for default shall hereby be solely with AGS and or assignees, acting in its capacity as guarantor of this Loan Guarantee, and the Obligee shall not be required to seek any remedy from the other Guarantor whatsoever.

     **5.  Solely Guarantee.**  AGS agrees that other than as is provided in this Loan Guarantee it may not demand of the Obligee that the Obligee shall (a) perform any thing or act, (b) give any notice, (c) furnish any clerical assistance, (d) render any service, (e) furnish any papers or documents, or (f) take any other action of any nature or description which is not required of the Obligee to be done under the contract

documents.

**6.  Limited Enforcement.**  No right of action shall accrue on this Loan Guarantee to or for the use of any person or corporation other than the Obligee named herein or the legal successors of the Obligee.

**7.  Guarantee Type.**  AGS, acting in its capacity as Individual Surety, hereby declares that this Loan Guarantee is a cash and cash equivalent guarantee, is an operating, fully-confirmed instrument and is subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600.

**8.  Counter Parts.**  This guarantee may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**9.  Governing Law.**  This guarantee shall be governed and construed in accordance with the law of the State of Nevada.

Signed and sealed this ___26 th___ day of _November, 2018_

IN THE PRESENCE OF:

_Jackie L. Robinson / x managing member_ (SEAL)
ALL NET LLC

_Jackie L. Robinson_
JACKIE L. ROBINSON, MANAGING MEMBER

AGS ASSURETY LLC.,
TIMOTHY J ARELLANO,
INDIVIDUAL SURETY        (SEAL)
Surety Company

_____
TIMOTHY J ARELLANO, POWER-
OF-ATTORNEY

Acknowledged
by: Tacsis LLC, LENDER

_____
KENT LIMSON, Managing Member
(Authorized Signatory)

State of Nevada
County of Clark
Subscribed and sworn to before me on
11/26/2018  by JACKIE ROBINSON
_Brett Neighbor_
Notary Public



State of Nevada
BRETT NEIGHBORS
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 17-1176-1
My Appt. Expires NOV. 30, 2019

Nov.26.2018  12:14 AM AGS INS.                    800 3556596              PAGE.  3/  5

# POWER OF ATTORNEY

### (Federally approved alternate to Treasury listed, circular 570)

State of Nevada>

        >SS Las Vegas

County of Clark>

I, the undersigned being duly sworn, depose and say that I am one of the sureties to the attached bond, that I am a citizen of the United States (or a permanent resident of the place where the contract and bond are executed) and of full age and legally competent; that I am not a partner in any business of the principal on the Bonds on which I appear as surety that the information herein below furnished is true and complete to the best of my knowledge. The affidavit is made to induce the Obligee to accept me as surety to the attached bond.

| | |
|---|---|
| 1. Attorney in Fact | 2. Name of Agency |
|     Timothy J Arellano | NA |

Att.-In-Fact for
    Timothy J Arellano, Individual Surety

| | |
|---|---|
| 3. Business Address (No., Street, City, State, Zip Code) | 4. Telephone Numbers |
|     6955 N. Durango Dr. Ste. 1115-339 |     Business-800-223-0370 |
|     Las Vegas, Nevada  89149 |     ALT-206-919-2149 |

5. THE FOLLOWING IS A TRUE REPRESENTATION OF MY PRESENT ASSETS, LIABILITIES AND NET WORTH AND DOES NOT INCLUDE ANY FINANCIAL INTEREST THAT I HAVE IN THE ASSETS OF THE PRINCIPLE ON THE ATTACHED BOND.

  Irrevocable Trust Receipt in the Amount of $1,136,022.00, issued by AGS ASSURETY Investment Trust holding company.

6. Signature



Attorney-in-Fact

7. SURETY BOND TO WHICH THIS
    AFFIDAVIT RELATED (Where Appropriate)
    BOND NUMBER: AANLLC-182111-002
    Loan Agreement:
    Parties: All Net Arena LLC & Tacsis LLC
    Dates Executed: November 21st , 2018

### Sworn to and subscribed before me

DATE OATH ADMINISTERED

City: Las Vegas    State: Nevada    Notary Public: Brett Neighbors

This 26th day of November, 2018

SIGNATURE x Brett Neighbors



BRETT NEIGHBORS
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 17-1176-1
My Appt. Expires NOV. 30, 2019

Nov.26.2018  12:15 AM AGS INS.                    800 3556596              PAGE.  4/ 5

# AFFIDAVIT OF INDIVIDUAL SURETY
### (Federally approved alternate to Treasury listed, circular 570)

State of Nevada>
       >SS Las Vegas

County of Clark>

I, the undersigned being duly sworn, depose and say that I am one of the sureties to the attached bond, that I am a citizen of the United States (or a permanent resident of the place where the contract and bond are executed) and of full age and legally competent; that I am not a partner in any business of the principal on the Bonds on which I appear as surety that the information herein below furnished is true and complete to the best of my knowledge. The affidavit is made to induce the Obligee to accept me as surety to the attached bond.

1. Affiant

    Timothy J Arellano

2. Address:

    6955 N. Durango dr. Ste. 1115-339
    Las Vegas, NV 89149

3. Business Address (No., Street, City, State, Zip Code)
    6955 N. Durango Dr. Ste. 1115-339
    Las Vegas, Nevada  89149

4. Telephone Numbers
    Business-800-223-0370
    ALT-206-919-2149

5. THE FOLLOWING IS A TRUE REPRESENTATION OF MY PRESENT ASSETS, LIABILITIES AND NET WORTH AND DOES NOT INCLUDE ANY FINANCIAL INTEREST THAT I HAVE IN THE ASSETS OF THE PRINCIPAL ON THE ATTACHED BOND.

*Irrevocable Trust Receipt in the Amount of $1,136,022.00, issued by AGS Assurety Investment Trust holding company.*

6. Signature



Timothy J. Arellano, Individual Surety

7. SURETY BOND TO WHICH THIS
    AFFIDAVIT RELATED (Where Appropriate)
        BOND NUMBER: ANLLC-182111-002
Loan Agreement:
Parties: All Net LLC and Tacsis LLC
Date Executed: November 21, 2018

*(AGS ASSURETY LLC — FEDERALLY APPROVED ALTERNATIVE CORPORATE SEAL ORIGINAL — NEVADA — TIMOTHY J ARELLANO INDIVIDUAL SURETY)*

## CONDITIONS:
This Bond is deemed placed and in force after 15 days of receipt by Principal and Obligee.  A "Consent of Surety" is required for release of all Progress Payments including retainage.  This is a guarantee, not an insurance policy.  By accepting this surety, the recipient is exercising their home rule right to accept an "Individual Surety" per Federal Regulations.  The Surety reserves the right to implement Funds Control at its Sole Discretion, and the Obligee is bound by this condition.

DATE OATH ADMINISTERED

*This 26th day of November, 2018*

SIGNATURE X *Brett Neighbors*

Sworn to and subscribed before me
City: Las Vegas    State: Nevada    Notary Public: *Brett Neighbors*



BRETT NEIGHBORS
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 17-1176-1
My Appt. Expires NOV. 30, 2019



## AGS ASSURETY INVESTMENT TRUST
**6955 N. Durango Drive Ste. 1115-339, Las Vegas, NV 89149**

## IRREVOCABLE TRUST RECEIPT

**Date of Issue: 11/21/2018**
**Date of Maturity:** 11/21/2019
**Receipt Number:** ANLLC-182111-002
**Name of Obligee/Lender: Kent Limson C/O The Carole Machado Revocable Trust 01/18/2017 (Restated 02/27/2017)**
**Principal:  All Net LLC**

Pursuant to the Security interest by AGS Assurety Investment Trust, with the authorized signature below, hereby irrevocably acknowledges with full Trustee responsibility, its receipt of cash/cash equivalent assets with a value of *One million One Hundred Thirty-Six Thousand Twenty-Two and 00/100 US* Dollars ($1,136,022.00), which shall be held for the above named Obligee/Lender.

Payment under this IRREVOCABLE TRUST RECEIPT, (ITR) will be made to the Obligee/Lender upon receipt of an invoice stating that such amount represents funds owed to the Obligee/Lender and are to be used to repay amounts outstanding certified to the offset and recovery by AGS Assurety Investment Trust and conditioned by the Surety Bond criteria until exonerated by the Obligee/Lender.  Said payment will be made within 45 banking days.

AAIT certify that this ITR is legally valid and authentic, free from liens and encumbrances of any kind whatsoever, free and clear of any taxes, levies, or duties of any nature present or future imposed under the laws of the State of Nevada AGS Assurety Investment Trust also declares that this ITR is an operating fully confirmed instrument and is subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce (ICC) Publication No. 600 and engaged us in accordance with terms thereof.

This ITR is void upon any discovery of fraud, deceit, or misrepresentation made by the Principal or Obligee/Lender, which includes any and all documentation submitted upon which the AAIT has relied. AGS Assurety Investment Trust shall not be liable or responsible for the interpretation of any provisions or terms of other contracts between the Principal and Obligee/Lender.

AGS Assurety Investment Trust

_____
Timothy J Arellano-Trustee and POA

AGS ASSURETY INVESTMENT TRUST
SEAL
~
ORIGINAL
★ STATE OF NEVADA ★



AGSSURE-01                     **BROOKEH**

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| **11/09/2018** |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

**IMPORTANT:** If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER License # 0252636<br>**United Agencies**<br>887 Patriot Drive, Ste. D<br>Moorpark, CA 93021 | CONTACT NAME: | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): **(805) 212-4890** | | FAX (A/C, No): **(805) 212-4891** |
| | E-MAIL ADDRESS: | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : **Admiral Indemnity Insurance Co.** | | **24856** |
| INSURED    Timothy J Arellano; AGS Assurety and Subsidiaries<br>AGS Entertainment, LLC<br>6955 N. Durango Drive Ste 115-339<br>Las Vegas, NV 89149<br>704 228th Ave NE STE. 762<br>Sammash, WA 98074 | INSURER B : **Twin City Fire Insurance Co.** | | **29459** |
| | INSURER C : **Arch Specialty Insurance Co.** | | **21199** |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| **B** | X **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE  X OCCUR | | | 72SBABA0797 | 02/28/2018 | 02/28/2019 | EACH OCCURRENCE | $ **2,000,000** |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ **2,000,000** |
| | | | | | | | MED EXP (Any one person) | $ **10,000** |
| | | | | | | | PERSONAL & ADV INJURY | $ **2,000,000** |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ **4,000,000** |
| | ☐ POLICY  ☐ PRO-JECT  ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ **4,000,000** |
| | ☐ OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| **B** | **UMBRELLA LIAB**  ☐ OCCUR<br>X **EXCESS LIAB**  X CLAIMS-MADE | | | 72SBABA0797 | 02/28/2018 | 02/28/2019 | EACH OCCURRENCE | $ **1,000,000** |
| | | | | | | | AGGREGATE | $ **1,000,000** |
| | ☐ DED  ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**  Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  N / A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | ☐ PER STATUTE  ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| **A** | **Professional Liab** | | | AX000009051-03 | 10/27/2018 | 10/27/2019 | Each / Agg | **4,000,000** |
| **C** | **Professional Liab** | | | SPL0061894-00 | 10/27/2018 | 10/27/2019 | Each / Agg | **4,000,000** |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
*30 days notice of cancellation except 10 days for non-payment of premium.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| **COPY** | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

**ACORD 25 (2016/03)**                     © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

| | |
|---|---|
| **From:** | Sue Jensen Martz <sue@rivieramortgagegroup.com> |
| **Sent:** | Tue 11/27/2018 11:12:50 PM (UTC) |
| **To:** | David Littlejohn <david@littlejohnfs.com>, "jackierobinson@allnetdevelopment.com" <jackierobinson@allnetdevelopment.com> |
| **Cc:** | 'Kent Limson' <kent@tacsis.com> |
| **Subject:** | All Net Loan for wet signatures if desired |
| **Attachment:** | All Net Loan 7123644 11_27_18 Final.pdf |

Please sign and return to my email or fax 310 684-2940.

Thank you,



Sue Jensen Martz
Broker/Owner
Riviera Mortgage Group
310 406-6865  cell
310 684-2940 fax
Sue@RivieraMortgageGroup.com
1845 S. Elena Avenue #100A
Redondo Beach, CA  90277
BRE #01055763   NMLS# 292065 & 292166

Celebrating 25 years in business!

# Addendum

### Pre-Payment Schedule

Except as provided below, Borrower may prepay this Loan in full by paying Lender the Pre-Payment Amount for the relevant pre-payment period, as set forth below, less the amount of any Loan payments made prior to the prepayment date, plus any unpaid fees or charges. The prepay period begins on the next calendar day following the date on which Lender distributed the loan proceeds to Borrower. In the event that a pre-payment discount's expiration date falls on a weekend or federal holiday, the expiration date shall become the following business day. A business day shall be Monday through Friday excluding any federal holidays or any dates that Lender is closed for business. Payment must be received by the lender (i.e. the date Lender's bank receives negotiable funds from Borrower) on or before the expiration date to receive the Pre-Payment Amount listed below. Except as provided in this addendum, all terms and conditions of Loan Agreement and the Supplement shall remain in full force and effect.

*Borrower shall have no right to prepay this Loan if:*
- The funds come from     Tacsis LLC a related entity, affiliate, assignee, or any another funding company in the form of a business loan or a merchant cash advance.
- There has been any delayed or missed payments.
- There has been any modifications to your agreement with Tacsis LLC
- There has been a breach or default of your agreement with Tacsis LLC

| | |
|---|---|
| Calendar Month Dec 2018 | $ 1,120,202.00 |
| Calendar Month Jan 2019 | $ 1,130,202.00 |
| Calendar Month Feb 2019 | $ 1,140,202.00 |
| Calendar Month Mar 2019 | $ 1,160,202.00 |
| Calendar Month Apr 2019 | $ 1,170,202.00 |
| Calendar Month May 2019 | $ 1,180,224.00 |
| Calendar Month Jun 2019 | $ 1,188,019.00 |
| Calendar Month Jul 2019 | $ 1,188,019.00 |
| Calendar Month Aug 2019 | $ 1,188,019.00 |
| Calendar Month Sep 2019 | $ 1,188,019.00 |
| Calendar Month Nov 2019 | $ 1,188,019.00 |

Initial Here: #1_____  #2_____  #3_____  #4 _____

**Tacsis LLC**
409 N. Pacific Coast Hwy Ste 696
Redondo Beach CA, 90277

**Authorization Agreement For
Direct Deposit (ACH Credit)
and Direct Payments (ACH Debits)**

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.

**DISBURSEMENT OF LOAN PROCEEDS.** *By signing below, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.*

**AUTOMATIC PAYMENT PLAN.** *Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By signing below, Borrower agrees to enroll in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's designated checking account in good standing or if there are insufficient funds in Borrower's checking account to process any payment.* **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**BUSINESS PURPOSE ACCOUNT.** *By signing below, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.*

**ACCOUNT CHANGES.** *Borrower agrees to notify Lender promptly if there are any changes to the account and routing numbers of the Designated Checking Account.*

**MISCELLANEOUS.** *Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.*

| Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) |
| --- |

*This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

Depository Name: Well Fargo Bank

Branch: 11730 West Charleston

| City: Las Vegas | State: Nevada | Zip: 89135 |
| --- | --- | --- |

Routing #: 121000248    Account # ███████████

Business Name (Print):    All Net LLC    Tax ID #: ███████████

Name (Type) Jackie L. Robinson    Title: Managing Member

Date: 11/27/2018

Page: 1 ✗    Initial Here: #1_____ #2_____ #3_____ #4_____

## BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

**Business Loan & Security Agreement Supplement**

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

**Borrower:** All Net LLC    **Mr. Jackie Robinson, Managing Member**

**Lender:**    **Tacsis LLC**

| | |
|---|---|
| **Disbursement Amount:** | $ 972,996.00 |
| *(Amount of Loan Less Fees)* | |

| | |
|---|---|
| **Amount of Loan ("Loan"):** | $ 1,079,200.00 |

| | |
|---|---|
| **Total Repayment Amount:** | $ 1,188,019.00 |
| *(Amount of Loan, Plus Interest Charge)* | |

**Payment Schedule:**

11 payments of $ 9,893 due at end of each Month beginning on 1/31/2019 With final interest and principle balance payment due of $1,089,093 on 11/30/2019 OR the sooner of , One year (365) days after the Loan Disbursement Amount is disbursed to you.

*("Business Day" means any Monday through Friday, except for Federal Reserve holidays.)*

| **Interest Charge:** | Total Interest Paid: | $ 108,819 |
|---|---|---|
| *(Dollar amount of interest excluding fees)* | | |

| **Fees:** | Origination Fee: | $ 16,002.00 |
|---|---|---|
| | Legal Fee: | $ 5,000.00 |
| | Bonding Fee: | $ 85,202.00 |

*If you elect to receive your funds via wire transfer, a separate fee may be deducted directly from your bank account in the amount indicated above.

**Borrower's Information**

| | |
|---|---|
| DBA: All Net LLC | Legal Entity: Limited Liability Corporation |
| Business Legal Name: All Net LLC | |

| Address: 2300 West Sahara Ave, Suite 800 | City: Las Vegas | State: NV | Zip: 89102 |
|---|---|---|---|

| | |
|---|---|
| Business Phone: | Fax #: |
| Federal State # (Tax ID): | Mobile #: |
| Website: | Email: |

Initial Here: #1_____ #2_____ #3_____ #4_____

**Littlejohn Decl. – Exhibit 7**
**Page 4 of 16**

**BUSINESS LOAN AND SECURITY AGREEMENT (LOAN# 7123644)**

**1    INTRODUCTION.** This Business Loan and Security Agreement ("Agreement") governs your business loan ("Loan") from **Tacsis LLC**. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" mean each individual or entity that signs this Agreement or on whose behalf this Agreement is signed. The words "Lender", "we", "us", and "our" mean **Tacsis LLC** or its successor(s) and assign(s). To help the government fight the funding of terrorism and money laundering activities, We will obtain, verify, and record information that identifies every customer. What this means to you: When you apply for a loan, we will ask your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**2    AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**3    LOAN FOR SPECIFIC PURPOSES ONLY. Borrower certifies that the Loan proceeds will be used for business purposes only and will not be used for personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/perso nal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section and Borrower acknowledges and agrees that Lender is relying on Borrower's representations and agreements concerning the Loan purpose. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regard- less of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for consumer purposes.**

**4    DISBURSEMENT OF LOAN PROCEEDS.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) **and upon verification of the validity of a financial guarantee bond with sufficient value to cover both the principle and partial interest of this loan listing <span style="color:red">The Carole A Machado Revocable Living Trust 1/18/17 (restated 2/27/17)</span> as the insured or obligee.**

**5    PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule shown in the Business Loan and Security Agreement Supplement. Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). If Lender debits from the Designated Checking Account any amount greater than the amount permitted under this Agreement (an "Unauthorized Amount"), Lender shall refund the Unauthorized Amount to Borrower within a reasonable time.

**6    DEFAULT.** To the extent not prohibited by applicable law, the occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment on three consecutive dates due and/ or, Borrower fails to pay any Obligations on three consecutive dates due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9–102 of the Uniform Commercial Code, to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower;

(xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee;

Page: 3    Initial Here: #1_____  #2_____  #3_____  #4 _____

(xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower; (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any guarantor of Borrower denies it has any further liability or obligation hereunder; (xxiv) any guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) Borrower dies; if Borrower is a sole proprietorship, the owner dies; if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

**7  RIGHTS AND REMEDIES UPON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A.  <u>Exercise the Financial Guarantee Bond</u>: Lender may make a claim with the guarantor of the financial guarantee bond naming the Lender as the obligee to satisfy in whole the remaining outstanding balance of this loan agreement. After default Lender will in good faith agree to allow **30** business days for borrower to cure and make whole the entire outstanding balance owed per the terms of the agreement before exercising Lender's right to make a claim on the Bond.

B.  <u>Debit Amounts Due From Borrower's Accounts</u>: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

C.  <u>Accelerate Indebtedness</u>: Lender may declare the entire Obligations immediately due and payable, without notice of any kind to Borrower.

D.  <u>Assemble Collateral</u>: Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

E.  <u>Sell the Collateral</u>: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent not prohibited by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

<u>Appoint Receiver</u>: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

F. <u>Collect Revenues, Apply Accounts</u>: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail ad- dressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender and/or may notify any merchant processors to remit to Lender any and all amounts received by the merchant processors from charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions.

G. <u>Obtain Deficiency</u>: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of    the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

H. <u>Other Rights and Remedies</u>: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to  time. In addition, Lender shall have and may exercise any  or all other rights and remedies it may have available at law, in equity or  otherwise.

I. <u>Election of Remedies</u>: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to per- form, shall not affect Lender's right to declare a default and exercise its remedies.

**8  ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must promptly mail or deliver a check to Lender in the amount of the missed payment or, if offered, make the missed payment by any pay-by-phone or on-line service that Lender may make available from time to time. If Borrower elects to send payments on Borrower's Account by postal mail, then Borrower agrees to send  such payments to **Tacsis LLC, 409 Pacific Coast Hwy Redondo Beach CA, 90277 or such other address as Lender notifies Borrower in writing.** All alternative payments must be made in good  funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower makes an alternative payment on Borrower's Loan by mail or by any pay-by-phone or on-line service that Lender makes available while Borrower  is enrolled  in the Automatic Payment Plan, Lender may treat such payment as  an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may re duce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received, in Lender's sole discretion.

**9  APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to apply payments to Borrower's Loan in any manner Lender chooses in Lender's sole  discretion.

**1 0  POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAY- MENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement. (A postdated check is a check dated later than the day it was actually presented for payment.)  Lender is under no obligation to  hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any post-dated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreem ent. All notices and written communications concerning postdated  checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed  amount) or any other disputed, nonconforming or qualified payments, must be delivered to Tacsis LLC, 409 Pacific Coast Hwy Redondo Beach CA, 90277 or such other address as Lender notifies Borrower in writing.**

**1 1  SECURITY INTEREST.** Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of

Page: 5        Initial Here: #1_____  #2_____  #3_____  #4  _____

Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the Loan described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes all Assets that Borrower now owns or hereafter acquires and wherever located including without limitation: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions; and (ii) all other tangible and intangible personal property, including, but not limited to (a) inventory, (b) equipment, (c) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (d) instruments, including promissory notes (e) chattel paper, including tangible chattel paper and electronic chattel paper, (f) documents, (g) letter of credit rights, (h) accounts, including healthcare insurance receivables, (i) deposit accounts, (j) commercial tort claims, (k) general intangibles, including payment intangibles and software and (l) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

**12   PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral, and that any financing statement may state that Borrower is prohibited from pledging or selling any receivables owing to Borrower now or in the future to any person or entity other than Lender during the term of this Agreement. In this Agreement "Lender's Representative" means any entity or individual affiliated with Lender that is designated by Lender to serve in such capacity.

**13   LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about in writing, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement, (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof, and (vi) Borrower shall not enter into any agreement that relates to or involves the pledge or sale of any receivables owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**14   TAXES, ASSESSMENTS AND LIENS.** Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

**15   INSURANCE.** Borrower shall procure and maintain such insurance as Lender may require with respect to the Col- lateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance, or obtain insurance that covers only Lender's interest, as Lender deems appropriate. Borrower shall promptly notify Lender of any loss of or damage to the Collateral.

**16   REPAIRS AND MAINTENANCE.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be led against the Collateral.

**17   INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Bor-

Page: 6                    Initial Here: #1_____ #2_____ #3 _____ #4 _____

rower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory grant Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purposes with any Lender employees and agents and with the general public. Lender, may, but is not required to use the name of any Borrower and Signatory as a credit in connection with any photograph and testimonial. Borrower and each Signatory waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**18  LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent not prohibited by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19  BORROWER'S REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the exact legal name of the Borrower is set forth in the application; (v) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other organization papers, or of any indenture, agreement or undertaking to which Borrower is a party; (vi) all organization papers and all amendments thereto of Borrower have been duly led and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (vii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or  prospects, and (b) is in compliance   with its organization  documents  and by-laws,  all  contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (viii) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral; and (ix) the Loan proceeds will only be used for non-personal, household, and/or household purposes and only as provided in the Use of Proceeds Certification below.

**20  INTEREST AND FEES.** Borrower agrees to pay the Interest Charge in full as set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in the Agreement, Borrower agrees to pay the following fees:

    A. <u>Origination Fee</u>: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

Page: 7

Initial Here: #1_____  #2_____  #3_____  #4_____

B. <u>Returned Payment Fee</u>: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if any payment made on Borrower's Loan is returned unpaid or dishonored (including any payment made via ACH or debit) for any reason.

C. <u>Late Fee</u>: A Late Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if a scheduled payment is not received by Lender as provided in the payment schedule set forth in the Business Loan and Security Agreement Supplement.

**1.     INTEREST AND FEE REFUNDS.** If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**2.     FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any guarantor's name, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or any guarantor's request, Lender will advise Borrower or guarantor if Lender obtained a credit report and Lender will give Borrower or guarantor the credit bureau's name and address. Borrower and each guarantor (if any) agree to submit current financial information, a new credit application, or both, in Borrower's name and in the name of each guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may report Lender's credit experiences with Borrower and any guarantor of Borrower's Loan to third parties as permitted by law. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower also agrees to allow Lender to share information regarding this Agreement with any trade association or similar group.

**3.     ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement   or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby.

**4.     BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to provide notice thereof to Lender in writing.

**5.     INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**6.     MERGERS, CONSOLIDATIONS OR SALES.** Borrower covenants that Borrower will not (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation.

**7.     CHANGE IN LEGAL STATUS.** Borrower covenants that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall forthwith notify Lender of such organizational identification number.

**8.     CONSENT TO JURISDICTION AND VENUE.** Borrower and Lender agree that any action or proceeding to enforce or arising

Page: 8          Initial Here: #1_____  #2_____  #3_____  #4_____

out of this agreement shall be commenced only in a court of the state of California, Court of Los Angeles, or in the United States Central District of California and Borrower waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower, or as otherwise provided by the laws of the State of California, or the United States of America. Borrower and Lender agree that venue is proper in such courts.

**29    NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concur- rently.

**30    ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Lender shall relea se Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection  with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party.

**31    INTERPRETATION.** Paragraph and section headings used  in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**32    SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same  shall  not  invalidate  or  render  illegal  or unenforceable such  provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**33    NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be  in  writing.  Notices  will be deemed given when deposited in the U.S. mail, postage prepaid, first class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier. Notice to Borrower will be sent to Borrower's last known address in Lender's records for this Loan. Notice to Lender may be sent to: **Tacsis LLC, 409 N Pacific Coast Hwy, Redondo Beach CA 90277 or such other address as Lender notifies Borrower in writing.**

**34    RECORDKEEPING REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement for more than four months after receipt of the same by Lender. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call at Borrower's place or places of business at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof.

**35    GOVERNING LAW.** Our relationship [including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement] is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) the law of the State of California without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws.

**36    WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., a guarantor), to the extent not prohibited by applicable law here- by, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent not prohibited by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agree: Lender is not required to le suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may,  but  will  not  be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to

Page: 9                            Initial Here: #1_____  #2_____  #3_____  #4_____

realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

**36    MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower on Borrower's cell phone and electronically by e-mail or by text message. Borrower understands that Borrower's cell phone service provider may charge Borrower for text messages, e-mails and calls and that Lender will not be responsible for those costs.

**37    JURY TRIAL WAIVER.** TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, BORROWER AND LENDER AND ANY GUARANTOR WAIVE THEIR RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THE AGREEMENT, THE PERSONAL GUARANTY, AND ALL OTHER DOCUMENTATION EVIDENCING THE OBLIGA-TIONS, IN ANY LEGAL ACTION OR PROCEEDING. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY COURT SITTING WITHOUT A JURY.

**39    ENTIRE AGREEMENT.** Any application Borrower signed or otherwise submitted in connection with the Loan, ac- companying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now  or in the future in connection with this Agreement  and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This  Agreement is the entire agreement  of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**40    COUNTERPARTS; ELECTRONIC AND FAX SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, electronic or fax signatures shall be treated in all respects as original signatures.

**41    EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower until all required security interests have been perfected and Lender has received all required personal guarantees or other documentation.

**42    CELL PHONE, E-MAIL AND ELECTRONIC TRANSACTIONS.** Borrower authorizes Lender and Lender's affiliates, agents and independent contractors to contact Borrower at any telephone number Borrower provides to Lender or from which Borrower places a call to Lender, or any telephone number where Lender believes it may reach Borrower, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Borrower incurs charges for receiving such com-munications. Lender and Lender's affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Borrower. Borrower expressly consents to conduct business by electronic means.

**43    PAYMENTS TO ISOS.** Borrower understands that some transactions funded by Lender are originated by third-party inde-pendent service organizations ("ISOs") who act as brokers. Lender compensates ISOs based on the amount of the loan a referred borrower obtains from Lender and, in some cases, the rate paid by the borrower.

**44    ARBITRATION.** If any of Borrower, Lender or a Guarantor requests, Borrower, Lender and the Guarantor agree to arbitrate all disputes and claims arising out of or relating to this Agreement and the Guaranty. If Borrower, Lender or a Guarantor seeks to have a dispute settled by arbitration, that person must first send to the other person(s) a written Notice of Intent to Arbitrate. If Borrower, Lender or the Guarantor do not reach an agreement to resolve the claim within 30 days after the Notice  is received, any person may commence an arbitration proceeding with the American Arbitration Association ("AAA"). Lender will promptly reimburse Borrower or the Guarantor any arbitration filing fee, however, in the event that both the Borrower and the Guarantor must pay filing fees, Lender will only reimburse the Borrower's arbitration filing fee and, except as provided in the next sentence, the Lender will pay all administration and arbitrator fees. If the arbitrator finds that either the substance of the claim raised by Borrower or the Guarantor or the relief sought by Borrower or the Guarantor is improper or not warranted, as measured by the standards set forth in Federal Rule of Procedure 11(b), then Lender will pay these fees only if required by the AAA Rules. If the arbitrator grants relief to the Borrower or the Guarantor that is equal to or greater than the value of what the Borrower or the Guarantor has requested in the arbitration, Lender shall reimburse Borrower or the Guarantor for that person's reasonable at-torneys' fees and expenses incurred for the arbitration. Borrower and the Guarantor agree that, by entering into this Agreement,

Page: 10    Initial Here: #1_____ #2_____ #3_____ #4_____

they are waiving the right to trial by jury. BORROWER, LENDER AND THE GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PERSON ONLY IN THEIR INDIVIDUAL CAPACITY, and not as a plaintiff or class member in any purported class or representative proceeding. Further, Borrower, Lender and the Guarantor agree that the arbitrator may not consolidate proceedings for more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific provision is found unenforceable, then the entirety of this arbitration clause shall be null and void.

**45.  NOTICE OF CONSENT TO ELECTRONIC COMMUNICATIONS** *: Borrower hereby consents and authorizes Lender and their affiliates to contact you at any telephone number or email address the Borrower provides, using any means of communication associated with the telephone number or email address , including, but not limited to, text messages via an automatic telephone dialing system. All automated communications systems will have an opt-out procedure in adherence to applicable law.*

By initialing here Borrower affirms that they have read the Notice of Consent to Electronic Communications:

**46.  CERTIFICATION AND SIGNATURES.**  By signing below or authorizing the person signing below to sign on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understood and agreed to be bound by its terms. Each person signing below certifies that each person is signing on behalf of the Borrower in the capacity indicated below the signer's name and that such signer is authorized to execute this Agreement on behalf of or the in stated relation to Borrower. Use of Proceeds Certification - As referred to in Section 3, by signing below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Loan will be used solely for purchasing or acquiring specific products or services, for the following purposes only:

- insurance (but not self-insurance programs)           - services or equipment
- merchandise, inventory or specified goods              - loans to finance specified sales transactions
- improvements / construction of facilities (but not purchase of re al estate) - public works projects or educational services (e.g., training)

> Section Intentionally Left Blank

Initial Here: #1_____ #2_____ #3_____ #4 _____

**Borrower 1**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print)

Name (Sign)

Title:

Date Signed:

**Borrower 3**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print)

Name (Sign)

Title:

Date Signed:

**Borrower 2**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print)

Name (Sign)

Title:

Date Signed:

**#4 Fiduciary Review and Due Diligence Acknowledgement**

*By signing below, I acknowledge that as the fiduciary responsible for the obligee /Insured **The Carole A Machado Revocable Living Trust 1/18/17 (restated 2/27/17)** have read through, understand and accept this agreement*

Name (Print): **David Littlejohn/ Littlejohn financial services**

Name (Sign)

Title:

Date Signed:

**Lender Use Only**

*For Lender's Use Only: This Agreement has been received and accepted by Lender in California after being signed by Borrower and any Guarantor(s).*

Name (Print): **Kent Limson on behalf of Tacsis LLC**

Name (Sign)

Title: Principal

Date Signed:

Page: 12          Initial Here: #1_____ #2_____ #3_____ #4_____

**LOAN PROCEEDS DISBURSEMENT AND AUTHORIZATION LETTER**

This Loan Proceeds Disburseme nt and Authorization Letter ("Letter") refer s to that certain Business Loan and Security Agreement (the "Agreement"), dated _November_____ _2018_ by and between __Tacsis LLC_____ the ("Lender "), and _All Net LLC_____ ("Borrower"). Capitalized terms used herein and not otherwise defined have the meaning ascribed to such terms in the Agreement.

The undersigned, on behalf of the Borrower, hereby authorizes and directs Lender to make the following disbursements (collectively, the "Disbursements") from the proceeds of the Loan:

| Authorized Payee: | Tacsis LLC | | |
|---|---|---|---|
| Address: | 409 N. Pacific Coast Hwy STE 696 | | |
| Address: | Redondo Beach         CA          90277 | | |
| Phone Number: | | | |
| Pay Amount: | $ 16,002.00 | | |
| Routing Number: | 211 170 114 | Account Number: | ▮▮▮▮▮▮ |

| Authorized Payee: | All Net LLC | | |
|---|---|---|---|
| Address: | 2300 West Sahara Ave. Suite 800 | | |
| Address: | Las Vegas              NV          89102 | | |
| Phone Number: | | | |
| Pay Amount: | $ 972,996.00 | | |
| Routing Number: | 121000248 | Account Number: | ▮▮▮▮▮▮ |

| Authorized Payee: | AGS Surety | | |
|---|---|---|---|
| Address: | 6955 N. Durango Dr Suite 115-339 | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | $ 85,202.00 | | |
| Routing Number: | 121201694 | Account Number: | ▮▮▮▮▮▮ |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

Lender has agreed to make the Disbursements direct above as an accommodation only . The Borrower acknowledges and agrees that upon disbursement of the loan proceeds as directed above, the Disbursements are not refundable to Borrower by Lender.

The undersigned, on behalf of the Borrower, hereby agrees to indemnify, defend, and hold Lender harmless from any and     all claims related to the Disbursements made in accordance with this Letter.

Initial Here: #1_____ #2_____ #3_____ #4 _____

BORROWER(s):

| X:_____ | X:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |
| X:_____ | X:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |

Lender

X:_____

Name: Kent Limson

Title:_____

Date:_____

| From: | Sue Jensen Martz <sue@rivieramortgagegroup.com> |
| --- | --- |
| Sent: | Wed 11/28/2018 8:19:46 PM (UTC) |
| To: | David Littlejohn <david@littlejohnfs.com> |
| Cc: | 'Kent Limson' <kent@tacsis.com>, Michelle Marsico <Michelle@villageviewescrow.com> |
| Subject: | All Net |
| Attachment: | All Net security agreement wet signed by Jackie.pdf |
| Attachment: | All Net security agreement esigned by Kent & Jackie.pdf |

Please see the attached Security Agreements – esigned by Kent & Jackie; wet signed by Jackie only.



Sue Jensen Martz
Broker/Owner
Riviera Mortgage Group
310 406-6865  cell
310 684-2940 fax
Sue@RivieraMortgageGroup.com
1845 S. Elena Avenue #100A
Redondo Beach, CA  90277
BRE #01055763    NMLS# 292065 & 292166

Celebrating 25 years in business!

## Addendum

### Pre-Payment Schedule

Except as provided below, Borrower may prepay this Loan in full by paying Lender the Pre-Payment Amount for the relevant pre-payment period, as set forth below, less the amount of any Loan payments made prior to the prepayment date, plus any unpaid fees or charges. The prepay period begins on the next calendar day following the date on which Lender distributed the loan proceeds to Borrower. In the event that a pre-payment discount's expiration date falls on a weekend or federal holiday, the expiration date shall become the following business day. A business day shall be Monday through Friday excluding any federal holidays or any dates that Lender is closed for business. Payment must be received by the lender (i.e. the date Lender's bank receives negotiable funds from Borrower) on or before the expiration date to receive the Pre-Payment Amount listed below. Except as provided in this addendum, all terms and conditions of Loan Agreement and the Supplement shall remain in full force and effect.

*Borrower shall have no right to prepay this Loan if:*
- The funds come from    Tacsis LLC a related entity, affiliate, assignee, or any another funding company in the form of a business loan or a merchant cash advance.
- There has been any delayed or missed payments.
- There has been any modifications to your agreement with Tacsis LLC
- There has been a breach or default of your agreement with Tacsis LLC

| | |
|---|---|
| Calendar Month Dec 2018 | $ 1,120,202.00 |
| Calendar Month Jan 2019 | $ 1,130,202.00 |
| Calendar Month Feb 2019 | $ 1,140,202.00 |
| Calendar Month Mar 2019 | $ 1,160,202.00 |
| Calendar Month Apr 2019 | $ 1,170,202.00 |
| Calendar Month May 2019 | $ 1,180,224.00 |
| Calendar Month Jun 2019 | $ 1,188,019.00 |
| Calendar Month Jul 2019 | $ 1,188,019.00 |
| Calendar Month Aug 2019 | $ 1,188,019.00 |
| Calendar Month Sep 2019 | $ 1,188,019.00 |
| Calendar Month Nov 2019 | $ 1,188,019.00 |

Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

Tacsis LLC
409 N. Pacific Coast Hwy Ste 696
Redondo Beach CA, 90277

**Authorization Agreement For
Direct Deposit (ACH Credit)
and Direct Payments (ACH Debits)**

**This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.**

**DISBURSEMENT OF LOAN PROCEEDS.** *By signing below, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.*

**AUTOMATIC PAYMENT PLAN.** *Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By signing below, Borrower agrees to enroll in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's designated checking account in good standing or if there are insufficient funds in Borrower's checking account to process any payment.* **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**BUSINESS PURPOSE ACCOUNT.** *By signing below, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.*

**ACCOUNT CHANGES.** *Borrower agrees to notify Lender promptly if there are any changes to the account and routing numbers of the Designated Checking Account.*

**MISCELLANEOUS.** *Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S.law.*

**Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)**

*This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| Depository Name: Well Fargo Bank | | | |
|---|---|---|---|
| Branch: 11730 West Charleston | | | |
| City: Las Vegas | State: Nevada | | Zip: 89135 |
| Routing #: 121000248 | | Account # | |
| Business Name (req): All Net LLC | | | Tax ID #: |
| Name (req): Jackie L. Robinson | | Title: Managing Member | |
| Date: 11/27/2018 | | | |

Page: 1  Initial Here: #1 _____ #2_____ #3_____ #4_____

Littlejohn Decl. - Exhibit 8
Page 3 of 31

## BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

**Business Loan & Security Agreement Supplement**

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

**Borrower:** All Net LLC    Mr. Jackie Robinson, Managing Member

**Lender:**    **Tacsis LLC**

**Disbursement Amount:**    $ 972,996.00

*(Amount of Loan Less Fees)*

**Amount of Loan ("Loan"):**    $ 1,079,200.00

**Total Repayment Amount:**    $ 1,188,019.00

*(Amount of Loan, Plus Interest Charge)*

**Payment Schedule:**    11 payments of $ 9,893    due at end of each **Month** beginning on **1/31/2019** With final interest and principle balance payment due of $1,089,093 on **11/30/2019 OR** the sooner of , One year (365) days after the Loan Disbursement Amount is disbursed to you.

*("Business Day" means any Monday through Friday, except for Federal Reserve holidays.)*

**Interest Charge:**    Total Interest Paid:    $ 108,819

*(Dollar amount of interest excluding fees)*

**Fees:**    Origination Fee:    $ 16,002.00
    Legal Fee:    $ 5,000.00
    Bonding Fee:    $ 85,202.00

*If you elect to receive your funds via wire transfer, a separate fee may be deducted directly from your bank account in the amount indicated above.*

**Borrower's Information**

| DBA: All Net LLC | Legal Entity: Limited Liability Corporation | | |
|---|---|---|---|
| Business Legal Name: All Net LLC | | | |
| Address: 2300 West Sahara Ave, Suite 800 | City: Las Vegas | State: NV | Zip: 89102 |
| Business Phone: | Fax #: | | |
| Federal State # (Tax ID): | Mobile #: | | |
| Website: | Email: | | |

Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

**BUSINESS LOAN AND SECURITY AGREEMENT (LOAN# 7123644)**

1  **INTRODUCTION.** This Business Loan and Security Agreement ("Agreement") governs your business loan ("Loan") from **Tacsis LLC.** Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" mean each individual or entity that signs this Agreement or on whose behalf this Agreement is signed. The words "Lender", "we", "us", and "our" mean **Tacsis LLC** or its successor(s) and assign(s). To help the government fight the funding of terrorism and money laundering activities, We will obtain, verify, and record information that identifies every customer. What this means to you: When you apply for a loan, we will ask your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

2  **AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

3  **LOAN FOR SPECIFIC PURPOSES ONLY.** Borrower certifies that the Loan proceeds will be used for business purposes only and will not be used for personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section and Borrower acknowledges and agrees that Lender is relying on Borrower's representations and agreements concerning the Loan purpose. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regard- less of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for consumer purposes.

4  **DISBURSEMENT OF LOAN PROCEEDS.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) **and upon verification of the validity of a financial guarantee bond with sufficient value to cover both the principle and partial interest of this loan listing The Carole A Machado Revocable Living Trust 1/18/17 (restated 2/27/17) as the insured or obligee.**

5  **PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule shown in the Business Loan and Security Agreement Supplement. Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). If Lender debits from the Designated Checking Account any amount greater than the amount permitted under this Agreement (an "Unauthorized Amount"), Lender shall refund the Unauthorized Amount to Borrower within a reasonable time.

6  **DEFAULT.** To the extent not prohibited by applicable law, the occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment on three consecutive dates due and/ or, Borrower fails to pay any Obligations on three consecutive dates due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9–102 of the Uniform Commercial Code, to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower;

(xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee;

Page: 3       Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

(xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower; (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any guarantor of Borrower denies it has any further liability or obligation hereunder; (xxiv) any guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) Borrower dies; if Borrower is a sole proprietorship, the owner dies; if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

1  **RIGHTS AND REMEDIES UPON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A.  Exercise the Financial Guarantee Bond: Lender may make a claim with the guarantor of the financial guarantee bond naming the Lender as the obligee to satisfy in whole the remaining outstanding balance of this loan agreement. After default Lender will in good faith agree to allow **30** business days for borrower to cure and make whole the entire outstanding balance owed per the terms of the agreement before exercising Lender's right to make a claim on the Bond.

B.  Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

C.  Accelerate Indebtedness: Lender may declare the entire Obligations immediately due and payable, without notice of any kind to Borrower.

D.  Assemble Collateral: Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

E.  Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent not prohibited by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

Appoint Receiver: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

Page: 4     Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

F. <u>Collect Revenues, Apply Accounts</u>: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail ad- dressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender and/or may notify any merchant processors to remit to Lender any and all amounts received by the merchant processors from charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions.

G. <u>Obtain Deficiency</u>: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

H. <u>Other Rights and Remedies</u>: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

I. <u>Election of Remedies</u>: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to per- form, shall not affect Lender's right to declare a default and exercise its remedies.

**8   ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must promptly mail or deliver a check to Lender in the amount of the missed payment or, if offered, make the missed payment by any pay-by-phone or on-line service that Lender may make available from time to time. If Borrower elects to send payments on Borrower's Account by postal mail, then Borrower agrees to send such payments to **Tacsis LLC, 409 Pacific Coast Hwy Redondo Beach CA, 90277 or such other address as Lender notifies Borrower in writing.** All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower makes an alternative payment on Borrower's Loan by mail or by any pay-by-phone or on-line service that Lender makes available while Borrower is enrolled in the Automatic Payment Plan, Lender may treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received, in Lender's solediscretion.

**9   APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to apply payments to Borrower's Loan in any manner Lender chooses in Lender's sole discretion.

**10   POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAY- MENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement. (A postdated check is a check dated later than the day it was actually presented for payment.) Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any post-dated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be delivered to Tacsis LLC, 409 Pacific Coast Hwy Redondo Beach CA, 90277 or such other address as Lender notifies Borrower in writing.**

**11   SECURITY INTEREST.** Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of

Page: 5   Initial Here: #1_____   #2_____   #3_____   #4 _____

Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the Loan described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes all Assets that Borrower now owns or hereafter acquires and wherever located including without limitation: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions; and (ii) all other tangible and intangible personal property, including, but not limited to (a) inventory, (b) equipment, (c) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (d) instruments, including promissory notes (e) chattel paper, including tangible chattel paper and electronic chattel paper, (f) documents, (g) letter of credit rights, (h) accounts, including healthcare insurance receivables, (i) deposit accounts, (j) commercial tort claims, (k) general intangibles, including payment intangibles and software and (l) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

**2   PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral, and that any financing statement may state that Borrower is prohibited from pledging or selling any receivables owing to Borrower now or in the future to any person or entity other than Lender during the term of this Agreement. In this Agreement "Lender's Representative" means any entity or individual affiliated with Lender that is designated by Lender to serve in such capacity.

**3   LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about in writing, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement, (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof, and (vi) Borrower shall not enter into any agreement that relates to or involves the pledge or sale of any receivables owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**4   TAXES, ASSESSMENTS AND LIENS.** Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

**5   INSURANCE.** Borrower shall procure and maintain such insurance as Lender may require with respect to the Col- lateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance, or obtain insurance that covers only Lender's interest, as Lender deems appropriate. Borrower shall promptly notify Lender of any loss of or damage to the Collateral.

**6   REPAIRS AND MAINTENANCE.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be led against the Collateral.

**7   INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Bor-

Page: 6          Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

rower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business,

(iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory grant Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purposes with any Lender employees and agents and with the general public. Lender, may, but is not required to use the name of any Borrower and Signatory as a credit in connection with any photograph and testimonial. Borrower and each Signatory waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**6    LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent not prohibited by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**6    BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the exact legal name of the Borrower is set forth in the application; (v) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other organization papers, or of any indenture, agreement or undertaking to which Borrower is a party; (vi) all organization papers and all amendments thereto of Borrower have been dulyled and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (vii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse  effect  on its  financial  condition, business or   prospects, and  (b) is in compliance      with its organization  documents  and  by-laws,   all   contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or  regulations the validity or applicability of  which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (viii) there is no action, suit, proceeding or  investigation pending  or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral; and (ix) the Loan proceeds will only be used for non-personal, household, and/or household purposes and only as provided in the Use of Proceeds Certification below.

**7    INTEREST AND FEES.** Borrower agrees to pay the Interest Charge in full as set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in the Agreement, Borrower agrees to pay the following fees:

A. Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

Page: 7          Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

B. Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if any payment made on Borrower's Loan is returned unpaid or dishonored (including any payment made via ACH or debit) for any reason.

C. Late Fee: A Late Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if a scheduled payment is not received by Lender as provided in the payment schedule set forth in the Business Loan and Security Agreement Supplement.

**1    INTEREST AND FEE REFUNDS.** If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**2    FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any guarantor's name, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or any guarantor's request, Lender will advise Borrower or guarantor if Lender obtained a credit report and Lender will give Borrower or guarantor the credit bureau's name and address. Borrower and each guarantor (if any) agree to submit current financial information, a new credit application, or both, in Borrower's name and in the name of each guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may report Lender's credit experiences with Borrower and any guarantor of Borrower's Loan to third parties as permitted by law. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower also agrees to allow Lender to share information regarding this Agreement with any trade association or similar group.

**3    ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement   or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be  considered advances to protect Lender's security, and shall be secured hereby.

**4    BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to provide notice thereof to Lender in writing.

**5    INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**6    MERGERS, CONSOLIDATIONS OR SALES.** Borrower covenants that Borrower will not (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation.

**7    CHANGE IN LEGAL STATUS.** Borrower covenants that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall forthwith notify Lender of such organizational identification number.

**8    CONSENT TO JURISDICTION AND VENUE.** Borrower and Lender agree that any action or proceeding to enforce or arising

Page: 8          Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

out of this agreement shall be commenced only in a court of the state of California, Court of Los Angeles, or in the United States Central District of California and Borrower waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower, or as otherwise provided by the laws of the State of California, or the United States of America. Borrower and Lender agree that venue is proper in such courts.

**ꓹ    NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concur- rently.

**ꓹ    ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Lender shall release Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party.

**ꓹ    INTERPRETATION.** Paragraph and section headings used  in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**ꓹ    SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same  shall  not invalidate  or  render  illegal  or unenforceable such  provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**ꓹ    NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be  in  writing.  Notices  will  be deemed given when deposited in the U.S. mail, postage prepaid, first class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier. Notice to Borrower will be sent to Borrower's last known address in Lender's records for this Loan. Notice to Lender may be sent to: **Tacsis LLC, 409 N Pacific Coast Hwy, Redondo Beach CA 90277 or such other address as Lender notifies Borrower in writing.**

**ꓹ    RECORDKEEPING REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement for more than four months after receipt of the same by Lender. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call at Borrower's place or places of business at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof.

**ꓹ    GOVERNING LAW.** Our relationship [including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement] is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) the law of the State of California without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws.

**ꓹ    WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., a guarantor), to the extent not prohibited by applicable law here- by, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent not prohibited by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agree: Lender is not required to le suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may,  but  will not  be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to

Page: 9        Initial Here: #1_____  #2_____  #3_____  #4_____

realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

**1. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower on Borrower's cell phone and electronically by e-mail or by text message. Borrower understands that Borrower's cell phone service provider may charge Borrower for text messages, e-mails and calls and that Lender will not be responsible for those costs.

**1. JURY TRIAL WAIVER.** TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, BORROWER AND LENDER AND ANY GUARANTOR WAIVE THEIR RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THE AGREEMENT, THE PERSONAL GUARANTY, AND ALL OTHER DOCUMENTATION EVIDENCING THE OBLIGA-TIONS, IN ANY LEGAL ACTION OR PROCEEDING. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY COURT SITTING WITHOUT A JURY.

**1. ENTIRE AGREEMENT.** Any application Borrower signed or otherwise submitted in connection with the Loan, ac- companying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**1. COUNTERPARTS; ELECTRONIC AND FAX SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, electronic or fax signatures shall be treated in all respects as original signatures.

**1. EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower until all required security interests have been perfected and Lender has received all required personal guarantees or other documentation.

**1. CELL PHONE, E-MAIL AND ELECTRONIC TRANSACTIONS.** Borrower authorizes Lender and Lender's affiliates, agents and independent contractors to contact Borrower at any telephone number Borrower provides to Lender or from which Borrower places a call to Lender, or any telephone number where Lender believes it may reach Borrower, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Borrower incurs charges for receiving such com-munications. Lender and Lender's affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Borrower. Borrower expressly consents to conduct business by electronic means.

**1. PAYMENTS TO ISOS.** Borrower understands that some transactions funded by Lender are originated by third-party inde-pendent service organizations ("ISOs") who act as brokers. Lender compensates ISOs based on the amount of the loan a referred borrower obtains from Lender and, in some cases, the rate paid by the borrower.

**1. ARBITRATION.** If any of Borrower, Lender or a Guarantor requests, Borrower, Lender and the Guarantor agree to arbitrate all disputes and claims arising out of or relating to this Agreement and the Guaranty. If Borrower, Lender or a Guarantor seeks to have a dispute settled by arbitration, that person must first send to the other person(s) by certified mail, a written Notice of Intent to Arbitrate. If Borrower, Lender or the Guarantor do not reach an agreement to resolve the claim within 30 days after the Notice is received, any person may commence an arbitration proceeding with the American Arbitration Association ("AAA"). Lender will promptly reimburse Borrower or the Guarantor any arbitration filing fee, however, in the event that both the Borrower and the Guarantor must pay filing fees, Lender will only reimburse the Borrower's arbitration filing fee and, except as provided in the next sentence, the Lender will pay all administration and arbitrator fees. If the arbitrator finds that either the substance of the claim raised by Borrower or the Guarantor or the relief sought by Borrower or the Guarantor is improper or not warranted, as measured by the standards set forth in Federal Rule of Procedure 11(b), then Lender will pay these fees only if required by the AAA Rules. If the arbitrator grants relief to the Borrower or the Guarantor that is equal to or greater than the value of what the Borrower or the Guarantor has requested in the arbitration, Lender shall reimburse Borrower or the Guarantor for that person's reasonable at-torneys' fees and expenses incurred for the arbitration. Borrower and the Guarantor agree that, by entering into this Agreement,

Page: 10    Initial Here: #1 _____   #2_____   #3_____   #4_____

Littlejohn Decl. - Exhibit 8
Page 12 of 31

they are waiving the right to trial by jury. BORROWER, LENDER AND THE GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PERSON ONLY IN THEIR INDIVIDUAL CAPACITY, and not as a plaintiff or class member in any purported class or representative proceeding. Further, Borrower, Lender and the Guarantor agree that the arbitrator may not consolidate proceedings for more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific provision is found unenforceable, then the entirety of this arbitration clause shall be null and void.

§ **NOTICE OF CONSENT TO ELECTRONIC COMMUNICATIONS**: *Borrower herby consents and authorizes Lender and their affiliates to contact you at any telephone number or email address the Borrower provides, using any means of communication associated with the telephone number or email address , including, but not limited to, text messages via an automatic telephone dialing system. All automated communications systems will have an opt-out procedure in adherence to applicable law.*

By initialing here Borrower affirms that they have read the Notice of Consent to Electronic Communications:

§ **CERTIFICATION AND SIGNATURES.** By signing below or authorizing the person signing below to sign on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understood and agreed to be bound by its terms. Each person signing below certifies that each person is signing on behalf of the Borrower in the capacity indicated below the signer's name and that such signer is authorized to execute this Agreement on behalf of or the in stated relation to Borrower. Use of Proceeds Certification - As referred to in Section 3, by signing below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Loan will be used solely for purchasing or acquiring specific products or services, for the following purposes only:

- insurance (but not self-insurance programs)                 - services or equipment
- merchandise, inventory or specified goods                   - loans to finance specified sales transactions
- improvements / construction of facilities (but not purchase of real estate) - public works projects or educational services (e.g., training)

Section Intentionally Left Blank

Page: 11        Initial Here: #1 _____   #2_____   #3_____   #4_____

**Borrower 1**

By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.

Name (Print): _Jackie L Robinson_

Name (Sign): _Jackie L Robinson_

Title: _Managing Member_

Date Signed: _NOV 21, 2018_

**Borrower 2**

By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.

Name (Print):

Name (Sign):

Title:

Date Signed:

**Lender Use Only**

For Lender's Use Only: This Agreement has been received and accepted by Lender in California after being signed by Borrower and any Guarantor(s).

Name (Print): **Kent Limson on behalf of Tacsis LLC**

Name (Sign):

Title: Principal

Date Signed:

**Borrower 3**

By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.

Name (Print):

Name (Sign):

Title:

Date Signed:

**#4 Fiduciary Review and Due Diligence Acknowledgement**

By signing below, I acknowledge that as the fiduciary responsible for the obligee /Insured **The Carole A Machado Revocable Living Trust 1/18/17 (restated 2/27/17)** I have read through, understand and accept this agreement

Name (Print): **David Littlejohn/ Littlejohn financial services**

Name (Sign):

Title:

Date Signed:

Page: 12    Initial Here: #1_____ #2_____ #3_____ #4_____

**Littlejohn Decl. - Exhibit 8**
**Page 14 of 31**

## LOAN PROCEEDS DISBURSEMENT AND AUTHORIZATION LETTER

ThisLoanProceedsDisbursementandAuthorizationLetter("Letter")referstothatcertainBusinessLoanandSecurity
Agreement (the "Agreement"), dated _November_____2018, by and between_Tacsis LLC_____the
("Lender"), and All Net LLC_____("Borrower"). Capitalized terms used herein and
not otherwise defined have the meaning ascribed to such terms in the Agreement.

The undersigned, on behalf of the Borrower, hereby authorizes and directs Lender to make the following
disbursements (collectively, the "Disbursements") from the proceeds of the Loan:

| Authorized Payee: | Tacsis LLC | | |
|---|---|---|---|
| Address: | 409 N. Pacific Coast Hwy STE 696 | | |
| Address: | Redondo Beach         CA        90277 | | |
| Phone Number: | | | |
| Pay Amount: | $ 16,002.00 | | |
| Routing Number: | 211 170 114 | Account Number: | |

| Authorized Payee: | All Net LLC | | |
|---|---|---|---|
| Address: | 2300 West Sahara Ave. Suite 800 | | |
| Address: | Las Vegas         NV        89102 | | |
| Phone Number: | | | |
| Pay Amount: | $ 972,996.00 | | |
| Routing Number: | 121000248 | Account Number: | |

| Authorized Payee: | AGS Surety | | |
|---|---|---|---|
| Address: | 6955 N. Durango Dr Suite 115-339 | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | $ 85,202.00 | | |
| Routing Number: | 121201694 | Account Number: | |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

Lender has agreed to make the Disbursements direct above as an accommodation only . The Borrower acknowledges
and agrees that upon disbursement of the loan proceeds as directed above, the Disbursements are not refundable to
Borrower by Lender.

The undersigned, on behalf of the Borrower, hereby agrees to indemnify, defend, and hold Lender harmless from any
and    all claims related to the Disbursements made in accordance with this Letter.

Initial Here: #1 _____  #2_____  #3_____  #4_____

BORROWER(s):

X: _Jackie L Robinson_

Name: _Jackie L. Robinson_

Title: _MAnaging Member_

Date: _Nov. 21, 2018_

X: _____

Name: _____

Title: _____

Date: _____

X: _____

Name: _____

Title: _____

Date: _____

X: _____

Name: _____

Title: _____

Date: _____

Lender

X: _____

Name: Kent Limson

Title: _____

Date: _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

# Addendum

### Pre-Payment Schedule

Except as provided below, Borrower may prepay this Loan in full by paying Lender the Pre-Payment Amount for the relevant pre-payment period, as set forth below, less the amount of any Loan payments made prior to the prepayment date, plus any unpaid fees or charges. The prepay period begins on the next calendar day following the date on which Lender distributed the loan proceeds to Borrower. In the event that a pre-payment discount's expiration date falls on a weekend or federal holiday, the expiration date shall become the following business day. A business day shall be Monday through Friday excluding any federal holidays or any dates that Lender is closed for business. Payment must be received by the lender (i.e. the date Lender's bank receives negotiable funds from Borrower) on or before the expiration date to receive the Pre-Payment Amount listed below. Except as provided in this addendum, all terms and conditions of Loan Agreement and the Supplement shall remain in full force and effect.

***Borrower shall have no right to prepay this Loan if:***

- The funds come from Tacsis LLC a related entity, affiliate, assignee, or any another funding company in the form of a business loan or a merchant cash advance.
- There has been any delayed or missed payments.
- There has been any modifications to your agreement with Tacsis LLC
- There has been a breach or default of your agreement with Tacsis LLC

| | |
|---|---|
| Calendar Month Dec 2018 | $ 1,120,202.00 |
| Calendar Month Jan 2019 | $ 1,130,202.00 |
| Calendar Month Feb 2019 | $ 1,140,202.00 |
| Calendar Month Mar 2019 | $ 1,160,202.00 |
| Calendar Month Apr 2019 | $ 1,170,202.00 |
| Calendar Month May 2019 | $ 1,180,224.00 |
| Calendar Month Jun 2019 | $ 1,188,019.00 |
| Calendar Month Jul 2019 | $ 1,188,019.00 |
| Calendar Month Aug 2019 | $ 1,188,019.00 |
| Calendar Month Sep 2019 | $ 1,188,019.00 |
| Calendar Month Nov 2019 | $ 1,188,019.00 |

Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

**Tacsis LLC**
409 N. Pacific Coast Hwy Ste 696
Redondo Beach CA, 90277

**Authorization Agreement For
Direct Deposit (ACH Credit)
and Direct Payments (ACH Debits)**

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.

**DISBURSEMENT OF LOAN PROCEEDS.** *By signing below, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.*

**AUTOMATIC PAYMENT PLAN.** *Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By signing below, Borrower agrees to enroll in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's designated checking account in good standing or if there are insufficient funds in Borrower's checking account to process any payment.* **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**BUSINESS PURPOSE ACCOUNT.** *By signing below, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.*

**ACCOUNT CHANGES.** *Borrower agrees to notify Lender promptly if there are any changes to the account and routing numbers of the Designated Checking Account.*

**MISCELLANEOUS.** *Lender is not responsible for any fees charged by Borrower's bank as the result of creditors debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.*

---

**Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)**

*This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

*Depository Name: Well Fargo Bank*

*Branch: 11730 West Charleston*

| *City: Las Vegas* | *State: Nevada* | *Zip: 89135* |
|---|---|---|

*Routing #: 121000248*   *Account #:* ▓▓▓▓▓

| *Business Name (Print): All Net LLC* | *Tax ID #:* ▓▓▓▓▓ |
|---|---|

| *Name (Type): Jackie L. Robinson* | *Title: Managing Member* |
|---|---|

*Date: 11/27/2018*

---

Page: 1    Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

## BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

---

**Business Loan & Security Agreement Supplement**

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

**Borrower:** All Net LLC    **Mr. Jackie Robinson, Managing Member**

**Lender:** **Tacsis LLC**

| | |
|---|---|
| **Disbursement Amount:** <br> *(Amount of Loan Less Fees)* | $ 972,996.00 |
| **Amount of Loan ("Loan"):** | $ 1,079,200.00 |
| **Total Repayment Amount:** <br> *(Amount of Loan, Plus Interest Charge)* | $ 1,188,019.00 |

**Payment Schedule:**  11 payments of $ 9,893 due at end of each Month beginning on 1/31/2019 With final interest and principle balance payment due of $1,089,093 on 11/30/2019 OR the sooner of , One year (365) days after the Loan Disbursement Amount is disbursed to you.

*("Business Day" means any Monday through Friday, except for Federal Reserve holidays.)*

**Interest Charge:**    Total Interest Paid:    $ 108,819
*(Dollar amount of interest excluding fees)*

**Fees:**    Origination Fee:    $ 16,002.00
         Legal Fee:    $ 5,000.00
         Bonding Fee:    $ 85,202.00
*If you elect to receive your funds via wire transfer, a separate fee may be deducted directly from your bank account in the amount indicated above.*

---

**Borrower's Information**

| DBA: All Net LLC | Legal Entity: Limited Liability Corporation |
|---|---|
| Business Legal Name: All Net LLC | |

| Address: 2300 West Sahara Ave, Suite 800 | City: Las Vegas | State: NV | Zip: 89102 |
|---|---|---|---|

| Business Phone: | Fax #: |
|---|---|
| Federal State # (Tax ID): | Mobile #: |
| Website: | Email: |

Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

BUSINESS LOAN AND SECURITY AGREEMENT (LOAN# **7123644**)

**1    INTRODUCTION.** This Business Loan and Security Agreement ("Agreement") governs your business loan ("Loan") from **Tacsis LLC**. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" mean each individual or entity that signs this Agreement or on whose behalf this Agreement is signed. The words "Lender", "we", "us", and "our" mean **Tacsis LLC** or its successor(s) and assign(s). To help the government fight the funding of terrorism and money laundering activities, We will obtain, verify, and record information that identifies every customer. What this means to you: When you apply for a loan, we will ask your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**2    AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**3    LOAN FOR SPECIFIC PURPOSES ONLY. Borrower certifies that the Loan proceeds will be used for business purposes only and will not be used for personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/perso nal purposes, and certa in important rights conferred upon consumers, pursuant to federal or state law will not apply to the Loan and the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section and Borrower acknowledges and agrees that Lender is relying on Borrower's representations and agreements concerning the Loan purpose. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regard- less of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for consumer purposes.**

**4    DISBURSEMENT OF LOAN PROCEEDS.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) **and upon verification of the validity of a financial guarantee bond with sufficient value to cover both the principle and partial interest of this loan listing <span style="color:red">The Carole A Machado Revocable Living Trust 1/18/17 (restated 2/27/17)</span> as the insured or obligee.**

**5    PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule shown in the Business Loan and Security Agreement Supplement. Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). If Lender debits from the Designated Checking Account any amount greater than the amount permitted under this Agreement (an "Unauthorized Amount"), Lender shall refund the Unauthorized Amount to Borrower within a reasonable time.

**6    DEFAULT.** To the extent not prohibited by applicable law, the occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment on three consecutive dates due and/ or, Borrower fails to pay any Obligations on three consecutive dates due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9−102 of the Uniform Commercial Code, to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower;

(xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee;

Page: 3        Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

(xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower; (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any guarantor of Borrower denies it has any further liability or obligation hereunder; (xxiv) any guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) Borrower dies; if Borrower is a sole proprietorship, the owner dies; if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

**7 RIGHTS AND REMEDIES UPON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. <u>Exercise the Financial Guarantee Bond</u>: Lender may make a claim with the guarantor of the financial guarantee bond naming the Lender as the obligee to satisfy in whole the remaining outstanding balance of this loan agreement. After default Lender will in good faith agree to allow **30** business days for borrower to cure and make whole the entire outstanding balance owed per the terms of the agreement before exercising Lender's right to make a claim on the Bond.

B. <u>Debit Amounts Due From Borrower's Accounts</u>: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

C. <u>Accelerate Indebtedness</u>: Lender may declare the entire Obligations immediately due and payable, without notice of any kind to Borrower.

D. <u>Assemble Collateral</u>: Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

E. <u>Sell the Collateral</u>: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent not prohibited by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

<u>Appoint Receiver</u>: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

Page: 4    Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

F.  <u>Collect Revenues, Apply Accounts</u>: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail ad- dressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender and/or may notify any merchant processors to remit to Lender any and all amounts received by the merchant processors from charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions.

G.  <u>Obtain Deficiency</u>: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of    the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

H.  <u>Other Rights and Remedies</u>: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to  time. In addition, Lender shall have and may exercise any  or all other rights and remedies it may have available at law, in equity or  otherwise.

I.  <u>Election of Remedies</u>: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to per- form, shall not affect Lender's right to declare a default and exercise its remedies.

**8  ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must promptly mail or deliver a check to Lender in the amount of the missed payment or, if offered, make the missed payment by any pay-by-phone or on-line service that Lender may make available from time to time. If Borrower elects to send payments on Borrower's Account by postal mail, then Borrower agrees to send  such payments to **Tacsis LLC, 409 Pacific Coast Hwy Redondo Beach CA, 90277 or such other address as Lender notifies Borrower in writing.** All alternative payments must be made in good  funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower makes an alternative payment on Borrower's Loan by mail or by any pay-by-phone or on-line service that Lender makes  available  while  Borrower  is  enrolled  in the Automatic Payment Plan, Lender may treat such payment as  an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may re duce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received, in Lender's sole discretion.

**9  APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to apply payments to Borrower's Loan in any manner Lender chooses in Lender's sole  discretion.

**10  POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAY- MENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement. (A postdated check is a check dated later than the day it was actually presented for payment.)  Lender is under no obligation to  hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any post-dated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreem ent. All notices and written communications concerning postdated  checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be delivered to Tacsis LLC, 409 Pacific Coast Hwy Redondo Beach CA, 90277 or such other address as Lender notifies Borrower in writing.**

**11  SECURITY INTEREST.** Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of

**Littlejohn Decl. - Exhibit 8**
**Page 22 of 31**

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the Loan described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes all Assets that Borrower now owns or hereafter acquires and wherever located including without limitation: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions; and (ii) all other tangible and intangible personal property, including, but not limited to (a) inventory, (b) equipment, (c) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (d) instruments, including promissory notes (e) chattel paper, including tangible chattel paper and electronic chattel paper, (f) documents, (g) letter of credit rights, (h) accounts, including healthcare insurance receivables, (i) deposit accounts, (j) commercial tort claims, (k) general intangibles, including payment intangibles and software and (l) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

**12    PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral, and that any financing statement may state that Borrower is prohibited from pledging or selling any receivables owing to Borrower now or in the future to any person or entity other than Lender during the term of this Agreement. In this Agreement "Lender's Representative" means any entity or individual affiliated with Lender that is designated by Lender to serve in such capacity.

**13    LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about in writing, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement, (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof, and (vi) Borrower shall not enter into any agreement that relates to or involves the pledge or sale of any receivables owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**14    TAXES, ASSESSMENTS AND LIENS.** Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

**15    INSURANCE.** Borrower shall procure and maintain such insurance as Lender may require with respect to the Col- lateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance, or obtain insurance that covers only Lender's interest, as Lender deems appropriate. Borrower shall promptly notify Lender of any loss of or damage to the Collateral.

**16    REPAIRS AND MAINTENANCE.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be led against the Collateral.

**17    INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Bor-

Page: 6          Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

rower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory grant Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purposes with any Lender employees and agents and with the general public. Lender, may, but is not required to use the name of any Borrower and Signatory as a credit in connection with any photograph and testimonial. Borrower and each Signatory waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**18    LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent not prohibited by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19    BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the exact legal name of the Borrower is set forth in the application; (v) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other organization papers, or of any indenture, agreement or undertaking to which Borrower is a party; (vi) all organization papers and all amendments thereto of Borrower have been duly led and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (vii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its organization documents and by-laws, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (viii) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral; and (ix) the Loan proceeds will only be used for non-personal, household, and/or household purposes and only as provided in the Use of Proceeds Certification below.

**20    INTEREST AND FEES.** Borrower agrees to pay the Interest Charge in full as set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in the Agreement, Borrower agrees to pay the following fees:

    A. <u>Origination Fee</u>: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

Page: 7    Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

B.  **Returned Payment Fee:** A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if any payment made on Borrower's Loan is returned unpaid or dishonored (including any payment made via ACH or debit) for any reason.

C.  **Late Fee:** A Late Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if a scheduled payment is not received by Lender as provided in the payment schedule set forth in the Business Loan and Security Agreement Supplement.

**1.    INTEREST AND FEE REFUNDS.** If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**2.    FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any guarantor's name, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or any guarantor's request, Lender will advise Borrower or guarantor if Lender obtained a credit report and Lender will give Borrower or guarantor the credit bureau's name and address. Borrower and each guarantor (if any) agree to submit current financial information, a new credit application, or both, in Borrower's name and in the name of each guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may report Lender's credit experiences with Borrower and any guarantor of Borrower's Loan to third parties as permitted by law. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower also agrees to allow Lender to share information regarding this Agreement with any trade association or similar group.

**3.    ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby.

**4.    BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to provide notice thereof to Lender in writing.

**5.    INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**6.    MERGERS, CONSOLIDATIONS OR SALES.** Borrower covenants that Borrower will not (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation.

**7.    CHANGE IN LEGAL STATUS.** Borrower covenants that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall forthwith notify Lender of such organizational identification number.

**8.    CONSENT TO JURISDICTION AND VENUE.** Borrower and Lender agree that any action or proceeding to enforce or arising

Page: 8        Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

out of this agreement shall be commenced only in a court or the state of California, Court of Los Angeles, or in the United States Central District of California and Borrower waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower, or as otherwise provided by the laws of the State of California, or the United States of America. Borrower and Lender agree that venue is proper in such courts.

**29    NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concur- rently.

**30    ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Lender shall relea se Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection  with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party.

**31    INTERPRETATION.** Paragraph and section headings used  in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**32    SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same  shall  not  invalidate  or  render  illegal  or unenforceable such  provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**33    NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be  in  writing.  Notices  will be deemed given when deposited in the U.S. mail, postage prepaid, first class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier. Notice to Borrower will be sent to Borrower's last known address in Lender's records for this Loan. Notice to Lender may be sent to: **Tacsis LLC, 409 N Pacific Coast Hwy, Redondo Beach CA 90277 or such other address as Lender notifies Borrower in writing.**

**34    RECORDKEEPING REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement for more than four months after receipt of the same by Lender. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call at Borrower's place or places of business at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof.

**35    GOVERNING LAW.** Our relationship [including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement] is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) the law of the State of California without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws.

**36    WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., a guarantor), to the extent not prohibited by applicable law here- by, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent not prohibited by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agree: Lender is not required to le suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may,  but  will  not  be obligated to, substitute, exchange or release any Collateral, or fail to

Page: 9                    Initial Here: #1_____  #2_____  #3_____  #4_____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

**37    MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower on Borrower's cell phone and electronically by e-mail or by text message. Borrower understands that Borrower's cell phone service provider may charge Borrower for text messages, e-mails and calls and that Lender will not be responsible for those costs.

**38    JURY TRIAL WAIVER.** TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, BORROWER AND LENDER AND ANY GUARANTOR WAIVE THEIR RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THE AGREEMENT, THE PERSONAL GUARANTY, AND ALL OTHER DOCUMENTATION EVIDENCING THE OBLIGA- TIONS, IN ANY LEGAL ACTION OR PROCEEDING. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY COURT SITTING WITHOUT A JURY.

**39    ENTIRE AGREEMENT.** Any application Borrower signed or otherwise submitted in connection with the Loan, ac- companying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**40    COUNTERPARTS; ELECTRONIC AND FAX SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, electronic or fax signatures shall be treated in all respects as original signatures.

**41    EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower until all required security interests have been perfected and Lender has received all required personal guarantees or other documentation.

**42    CELL PHONE, E-MAIL AND ELECTRONIC TRANSACTIONS.** Borrower authorizes Lender and Lender's affiliates, agents and independent contractors to contact Borrower at any telephone number Borrower provides to Lender or from which Borrower places a call to Lender, or any telephone number where Lender believes it may reach Borrower, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Borrower incurs charges for receiving such com- munications. Lender and Lender's affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Borrower. Borrower expressly consents to conduct business by electronic means.

**43    PAYMENTS TO ISOS.** Borrower understands that some transactions funded by Lender are originated by third-party inde- pendent service organizations ("ISOs") who act as brokers. Lender compensates ISOs based on the amount of the loan a referred borrower obtains from Lender and, in some cases, the rate paid by the borrower.

**44    ARBITRATION.** If any of Borrower, Lender or a Guarantor requests, Borrower, Lender and the Guarantor agree to arbitrate all disputes and claims arising out of or relating to this Agreement and the Guaranty. If Borrower, Lender or a Guarantor seeks to have a dispute settled by arbitration, that person must first send to the other person(s) a written Notice of Intent to Arbitrate. If Borrower, Lender or the Guarantor do not reach an agreement to resolve the claim within 30 days after the Notice is received, any person may commence an arbitration proceeding with the American Arbitration Association ("AAA"). Lender will promptly reimburse Borrower or the Guarantor any arbitration filing fee, however, in the event that both the Borrower and the Guarantor must pay filing fees, Lender will only reimburse the Borrower's arbitration filing fee and, except as provided in the next sentence, the Lender will pay all administration and arbitrator fees. If the arbitrator finds that either the substance of the claim raised by Borrower or the Guarantor or the relief sought by Borrower or the Guarantor is improper or not warranted, as measured by the standards set forth in Federal Rule of Procedure 11(b), then Lender will pay these fees only if required by the AAA Rules. If the arbitrator grants relief to the Borrower or the Guarantor that is equal to or greater than the value of what the Borrower or the Guarantor has requested in the arbitration, Lender shall reimburse Borrower or the Guarantor for that person's reasonable at- torneys' fees and expenses incurred for the arbitration. Borrower and the Guarantor agree that, by entering into this Agreement,

Page: 10    Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

they are waiving the right to trial by jury. BORROWER, LENDER AND THE GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PERSON ONLY IN THEIR INDIVIDUAL CAPACITY, and not as a plaintiff or class member in any purported class or representative proceeding. Further, Borrower, Lender and the Guarantor agree that the arbitrator may not consolidate proceedings for more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific provision is found unenforceable, then the entirety of this arbitration clause shall be null and void.

**45. NOTICE OF CONSENT TO ELECTRONIC COMMUNICATIONS** : *Borrower hereby consents and authorizes Lender and their affiliates to contact you at any telephone number or email address the Borrower provides, using any means of communication associated with the telephone number or email address , including, but not limited to, text messages via an automatic telephone dialing system. All automated communications systems will have an opt-out procedure in adherence to applicable law.*

By initialing here Borrower affirms that they have read the Notice of Consent to Electronic Communications:

**46. CERTIFICATION AND SIGNATURES.** By signing below or authorizing the person signing below to sign on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understood and agreed to be bound by its terms. Each person signing below certifies that each person is signing on behalf of the Borrower in the capacity indicated below the signer's name and that such signer is authorized to execute this Agreement on behalf of or the in stated relation to Borrower. Use of Proceeds Certification - As referred to in Section 3, by signing below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Loan will be used solely for purchasing or acquiring specific products or services, for the following purposes only:

- insurance (but not self-insurance programs)          - services or equipment
- merchandise, inventory or specified goods            - loans to finance specified sales transactions
- improvements / construction of facilities (but not purchase of re al estate) - public works projects or educational services (e.g., training)

Section Intentionally Left Blank

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

**Borrower 1**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign): *Jackie Robinson*
658E41E1B72046E...

Title:

Date Signed:  11/27/2018  3:48:30  PM  PST

**Borrower 3**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign):

Title:

Date Signed:

**Borrower 2**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign):

Title:

Date Signed:

**#4 Fiduciary  Review  and Due  Diligence  Acknowledgement**

*By signing below, I acknowledge that as the fiduciary responsible for the obligee /Insured **The Carole A Machado Revocable  Living  Trust 1/18/17 (restated 2/27/17)** have read through, understand and accept this agreement*

Name (Print): **David Littlejohn/ Littlejohn financial services**

Name (Sign):

Title:

Date Signed:

**Lender  Use  Only**

*For Lender's Use Only: This Agreement has been received and accepted by Lender in California after being signed by Borrower and any Guarantor(s).*

Name (Print): **Kent  Limson  on behalf  of Tacsis  LLC**

Name (Sign): ACA1AB446...

Title: **Principal**

Date  Signed:  11/27/2018  3:03:52  PM  PST



Page: 12    Initial Here: #1 _JR_____ #2_____ #3_____ #4_____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

## LOAN PROCEEDS DISBURSEMENT AND AUTHORIZATION LETTER

This Loan Proceeds Disburseme ntand Authorization Letter ("Letter") refer stothatcertainBusinessLoanandSecurity Agreement (the "Agreement"), dated _November_____ 2018 by and between   Tacsis LLC_____ the ("Lender "), and  All Net LLC_____ ("Borrower").  Capitalized  terms used herein and not otherwise  defined  have the meaning  ascribed  to such terms in the Agreement.

The undersigned, on behalf of the Borrower, hereby authorizes and directs Lender to make the following disbursements (collectively, the "Disbursements") from the proceeds of the Loan:

| Authorized Payee: | Tacsis LLC | | |
|---|---|---|---|
| Address: | 409 N. Pacific Coast Hwy STE 696 | | |
| Address: | Redondo Beach          CA          90277 | | |
| Phone Number: | | | |
| Pay Amount: | $ 16,002.00 | | |
| Routing Number: | 211 170 114 | Account Number: | ███████ |

| Authorized Payee: | All Net LLC | | |
|---|---|---|---|
| Address: | 2300 West Sahara Ave. Suite 800 | | |
| Address: | Las Vegas              NV          89102 | | |
| Phone Number: | | | |
| Pay Amount: | $ 972,996.00 | | |
| Routing Number: | 121000248 | Account Number: | ███████ |

| Authorized Payee: | AGS Surety | | |
|---|---|---|---|
| Address: | 6955 N. Durango Dr Suite 115-339 | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | $ 85,202.00 | | |
| Routing Number: | 121201694 | Account Number: | ███████ |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

Lender has agreed to make the Disbursements direct above as an accommodation only . The Borrower acknowledges and agrees that upon disbursement of the loan proceeds as directed above, the Disbursements are not refundable to Borrower by Lender.

The undersigned, on behalf of the Borrower, hereby agrees to indemnify, defend, and hold Lender harmless from any and     all claims related to the Disbursements made in accordance with this Letter.



Initial Here: #1 _____ #2_____ #3_____ #4_____

DocuSign Envelope ID: 35A5787C-9059-47D5-BD6A-F1F3FF580471

BORROWER(s):

X: _Jackie Robinson_       X:_____

Name:_____41E1872046E_       Name:_____

Title:_____       Title:_____

Date:_____       Date:_____
11/27/2018 3:48:30 PM PST

X:_____       X:_____

Name:_____       Name:_____

Title:_____       Title:_____

Date:_____       Date:_____

Lender

X:_____

Name:__Kent Limson__    B32AE2AC61A6F4E

Title:_____

Date:_____
11/27/2018 3:03:52 PM PST