IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CHERI PIKE and CAROLE MACHADO, as Co-Trustees of the Carole A. Machado Revocable Living Trust, <br><br> Plaintiffs, <br><br> v. <br><br> LITTLEJOHN FINANCIAL SERVICES, INC., an Oregon corporation; FRED DAVID LITTLEJOHN II, an individual, <br><br> Defendants. | Case No. 6:24-cv-00707-MC <br><br> OPINION AND ORDER |

MCSHANE, Judge:

Plaintiffs Cheri Pike and Carole Machado, as Co-Trustees of the Carole A. Machado Revocable Living Trust, bring claims for malpractice, common law negligence, breach of fiduciary duty, and financial elder abuse against their financial advisors, Defendants Littlejohn Financial Services, Inc. and Fred Littlejohn. 2d Am. Compl. ("SAC"), ECF No. 57. Defendants move to dismiss Plaintiffs' claim for financial elder abuse alleged in the SAC pursuant to Fed. R. Civ. P. 12(b)(6). Defs.' Mot., ECF No. 64. Defendants argue Plaintiffs have not stated a claim for either direct or indirect financial elder abuse under Oregon law. *Id.* at 2.

Defendants' Motion (ECF No. 64) is GRANTED IN PART as to a theory of indirect financial elder abuse and DENIED IN PART as to a theory of direct financial elder abuse.

1 – Opinion & Order

## BACKGROUND

The following is drawn from the allegations of the SAC. The Machado Trust engaged Defendants to serve as investment advisors from July 2017 to May 2021. SAC ¶ 7. In this role, Defendants provided investment advice and were authorized to manage Trust assets amounting to nearly $20 million on a discretionary basis. *Id*. ¶¶ 10–11. For this service, Defendants charged the Trust an annual fee of 0.5% of the value of the assets Defendants managed. *Id*. Plaintiffs trusted that Defendants would provide competent financial advice in keeping with their fiduciary obligations. *Id*. ¶¶ 9–12.

In November 2018, Defendants recommended the Machado Trust invest over one million dollars with Kent Limson and his company, Tacsis LLC, for the benefit of All Net LLC's sports arena development project on the Las Vegas Strip. SAC ¶ 13. This investment was presented to Plaintiffs as a "highly lucrative" opportunity. *Id*. ¶ 14. Defendants conveyed to Plaintiffs that Mr. Limson guaranteed the Trust would realize an 11% return once the investment was redeemed after one year. *Id.* Further, Defendants conveyed to Plaintiffs that their investment would be "'secured' by a 'financial guarantee bond,'" according to Mr. Limson. *Id*. ¶ 15.

At the time these representations were made, Plaintiffs did not know that legitimate bonding companies do not generally offer guarantees for repayment of private investments. SAC ¶ 15. Defendants informed Plaintiffs that the guarantor would be Timothy Arellano of AGS Assurety LLC. *Id*. ¶ 16. However, unbeknownst to Plaintiffs and Defendants, Mr. Arellano and AGS were not licensed to provide insurance or bonding services. *Id*. ¶ 18. Defendants did not confirm whether Mr. Arrellano and AGS were licensed to provide insurance or bonding services, nor whether Mr. Arrellano and AGS had the financial resources to provide a guarantee on a loan worth $1 million. *Id*. ¶¶ 17–18. Additionally, Defendants told Plaintiffs that Mr. Limson claimed

that the bond from AGS was "backed by 100% E&O (errors and omissions) Policy." *Id*. ¶ 19. Defendants never obtained proof of such an insurance policy. *Id*. As it turns out, this policy did not exist. *Id*. Plaintiffs were not made aware that legitimate insurance companies do not generally provide errors and omissions coverage for defaults by guarantors of private loans. *Id*.

Plaintiffs received little to no documentation regarding either the transfer of the Trust's funds to Tacsis or the layers of purported insurance covering their investment. SAC ¶ 20. Defendants provided Plaintiffs with a disbursement authorization form to authorize a wire transfer of $1,079,200 from the Trust to an escrow company in California. *Id*. ¶ 21. However, Defendants did not request that the Trust's investment and its right to repayment otherwise be documented in a written contract. *Id*. Plaintiffs also obtained a "Financial Loan Guarantee" executed by Mr. Arrellano and AGS, which indicated it was provided in connection with a "loan contract agreement" between All Net and the Trust. *Id*. ¶ 25. As it turns out, no contract ever existed. *Id*.

Plaintiffs allege that Defendants failed to perform due diligence in researching the proposed development led by Mr. Robinson, the recipient of the Trust's funds. SAC ¶ 26. Thorough research of the investment would have uncovered Mr. Jonhson's "dubious" history of attempting to secure funding for the arena. *Id*. In 2013, Mr. Robinson announced finally having the "proper financing in place" and that the arena would be completed in 2016. *Id*. ¶ 27. However, by 2016 there was still no progress on the construction of the arena. *Id*. In 2017, Mr. Robinson claimed to have secured a loan from Credit Suisse. *Id*. ¶ 28. In 2018, Mr. Johnson publicly announced receiving a $3 billion loan from the International Bank of Qatar, which was the same year Tacsis made at least seven loans to All Net with funds derived from multiple investors including the Trust. *Id*. In 2019, Mr. Robinson appeared before the Clark County Commission, now describing "a complex plan involving money in Qatar, people in Zurich, central banks in

Europe and the U.S., lines of credit, funds moving from one bank to another, and state of Nevada revenue bonds." *Id*. Plaintiffs contend that had Mr. Robinson truly had institutional-level funding for his project, he would not have been soliciting small private investments like the Trust's. *Id*. ¶ 29. In addition to the lack of research regarding the institutional financing, Defendants failed to familiarize themselves with easily accessible information about the proposed project. *Id*. ¶ 30. Plaintiffs allege Defendants instead "blindly" recommended that they invest in this "supposed 'opportunity.'" *Id*.

Tacsis used the money invested by the Trust to provide a series of loans to All Net. SAC ¶ 22. Plaintiffs' investment did not get redeemed after one year, let alone realize an 11% return. *Id*. ¶ 32. While the Trust received interest payments from February to August of 2019, All Net ultimately defaulted on the loans from Tacsis and no further payments materialized. *Id*. The Trust lost its full investment as well as the opportunity to earn ordinary returns on its invested funds. *Id*. Mr. Limson and Tacsis brought a state court action in California to attempt to collect the debts against All Net, Mr. Jackie L. Robinson, AGS, and Mr. Arellano. *Id*. ¶ 33. Plaintiffs claim that case has "stalled." *Id*.

In October 2022, Plaintiffs and Defendants executed an agreement tolling the statute of limitations on the Trust's claims against Defendants. SAC ¶ 34. This action followed. In response to the First Amended Complaint, Defendants asserted that their discretionary authority over the Trust's assets was "limited to those assets 'contained in Charles Schwab accounts' and 'did not extend to the Stadium Deal.'" *Id*. ¶ 35.[1] Despite this representation, Defendants calculated their monthly advisory fee by including the $1,079,200 investment to All Net as part of the "fair market value of portfolio assets under management in the Account" from the time of the All Net

---

[1] Plaintiffs' Second Amended Complaint duplicates ¶¶ 35–39. The citations here refer to the first appearance of each numbered paragraph.

investment to the time that Plaintiffs terminated Defendants' services. *Id.* ¶ 36. Defendants never informed Plaintiffs that they calculated their advisory fee by including the $1,079,200 investment even though this amount was no longer in the Schwab account. *Id.* ¶ 37. After no funds were repaid as promised, Defendants continued to use $1,079,200 as the fair market value of the investment without adjustment, until their services were terminated. *Id.* ¶ 38. Further, Defendants did not inform Plaintiffs that although Defendants were charging the same advisory fee on the $1,079,200 investment as the assets in the Schwab account, they did not consider themselves to have the same fiduciary duties with respect to those funds. *Id.* ¶ 39. After the parties stipulated to extend the deadline to file the SAC and while the case was stayed pending settlement discussions, Defendants sent a payment to Plaintiffs characterized as a refund of fees collected related to the stadium deal. *Id.* at p.11 n.5.

## **LEGAL STANDARD**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atl.Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 679.

When considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless "the pleading could not possibly

be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## DISCUSSION

Defendants move to dismiss Plaintiffs' claim for financial elder abuse. To state a claim for financial elder abuse under Or. Rev. Stat. § 124.100, Plaintiffs must plead Defendants wrongfully took or appropriated money or property of a vulnerable person. Or. Rev. Stat. § 124.110(1)(a). Financial abuse under Or. Rev. Stat. § 124.100 can take two forms, indirect and direct. Or. Rev. Stat. § 124.100(5) provides for indirect abuse, stating "[a]n action may be brought under this section against a person for *permitting* another person to engage in physical or financial abuse if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the physical or financial abuse." Financial abuse under Or. Rev. Stat. § 124.110(1)(a) is defined as "when a person wrongfully takes or appropriates money or property of a vulnerable person, without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the vulnerable person." A taking or appropriation of money or property is wrongful when it occurs under circumstances that are injurious, unjust, or unfair, taking into account the special vulnerability of the protected person. *Adelsperger v. Elkside Dev. LLC*, 373 Or. 621, 652–53 (2025), *as modified on reconsideration*, 374 Or. 375 (2025). A vulnerable person under Or. Rev. Stat. § 124.110(1)(a) includes elderly people 65 years of age or older. It is uncontested that Plaintiff Machado qualifies as a vulnerable person under this statute.

Defendants argue Plaintiffs fail to state a claim as to either form of financial abuse. The Court considers these arguments in turn.

### I.    Indirect Financial Abuse

Plaintiffs contend that Defendants permitted Mr. Limson and his company, Tacsis, to financially abuse Plaintiffs under Or. Rev. Stat. § 124.100(5) and Or. Rev. Stat. § 124.110(1)(a) when Defendants conveyed false information they should have known to be false and facilitated

6 – Opinion & Order

Plaintiffs' investment with Mr. Limson and Tacsis. SAC ¶ 53. In particular, Defendants argue Plaintiffs have not pleaded facts that plausibly establish the "wrongful" element under Or. Rev. Stat. § 124.110(1)(a). Defs.' Mot. 5. Defendants also assert that Plaintiffs fail to allege facts showing that Defendants had constructive knowledge of the financial abuse required under Or. Rev. Stat. § 124.100(5). *Id.*

Plaintiffs have inadequately pleaded that Mr. Limson and Tacsis acted wrongfully. In *Adelsperger*, the Oregon Supreme Court recently considered the wrongfulness prong of the financial elder abuse statute. There, the defendant bought an RV park where elderly residents had "lifetime memberships." *Adelsperger*, 373 Or. at 629. The defendant purchased the RV park for less than its appraised value because the seller ensured the price reflected that residents' lifetime membership contracts "went with the park." *Id.* at 660. After purchasing the park, the defendant did not honor the memberships. *Id.* at 630. From these facts, the *Adelsperger* court found that there was sufficient evidence from which a jury could find that the defendant acted "wrongful[ly]" under Or. Rev. Stat. § 124.110(1)(a) because the defendant had purchased the property at a reduced price reflecting the lifetime memberships, but refused to honor the memberships, depriving some plaintiffs of their residences. *Id.* at 650; *see also id.* at 660–61 ("defendant's refusal to honor the membership contracts constituted [wrongful conduct,] because defendant would be unjustly enriched under common-law equitable principles at the expense of the elderly plaintiffs, some of whom lived full time at the campground, if defendant were allowed to repudiate the membership contracts under those circumstances").

This case is distinguishable from *Adelsperger* in a crucial way. Plaintiffs plead Mr. Limson and Tacsis guaranteed the Trust would realize an 11% return after redemption of the investment, promised the investment would be "secured" by a "financial guarantee bond," told Plaintiffs the

bond was backed by a "100% E&O Policy," without providing Plaintiffs a formal contract memorializing the terms of the transfer. SAC ¶¶ 14–20. None of the assurances made by Mr. Limson and Tacsis regarding the investment came to fruition. *Id*. ¶ 32. The terms were not honored, and as a result of its investment, the Trust lost its full $1,079,200 investment and the opportunity to earn "ordinary returns" on its invested funds. *Id*. Therefore, like the owner in *Adelsperger* who benefitted at the expense of vulnerable residents by acquiring the RV park at a price that accounted for their lifetime memberships and then refusing to honor the memberships, Mr. Limson and Tacsis obtained the benefit of Plaintiffs' valuable investment based on their representations regarding the terms of the investment. However, the defendant in *Adelsperger* intentionally did not honor the memberships, making a unilateral decision once the purchase had been made. Here, meanwhile, Mr. Limson and Tacsis did not follow through on their guarantees because All Net and Mr. Robinson defaulted on their loans. Unlike in *Adelsperger*, there are no allegations in this case indicating Mr. Limson and Taciss received the Trust's investment with the intention of not returning it at the outset, or that they failed to return the investment on purpose, *independent* of All Net's and Mr. Robinson's default. Construing the alleged facts in the light most favorable to Plaintiffs as the non-moving party, Plaintiffs' allegations therefore do not plausibly establish Mr. Limson's and Tacsis' conduct was "knowingly injurious[], unjust or unfair under the circumstances." *Adelsperger*, 373 Or. at 654.

Because Plaintiffs have not sufficiently pleaded facts that plausibly establish Mr. Limson and Tacsis engaged in wrongful conduct, Plaintiffs have not stated a claim for indirect financial abuse and the Court need not address the "knowing" portion of the claim.

## II.     Direct Financial Abuse

Plaintiffs also allege that Defendants directly financially abused Plaintiff Machado by

charging "fraudulent fees" on the investment. SAC ¶ 54. Defendants argue that because they refunded the disputed fee, there was no taking or appropriation as required by Or. Rev. Stat. § 124.110(1)(a). For purposes of Or. Rev. Stat. § 124.110(1)(a), to take means to "transfer into one's own use, possession or ownership," and to appropriate means "to exercise control over property of another permanently or for so extended a period or under such circumstances as to acquire the major portion of the economic value or benefit of such property." *Adelsperger*, 373 Or. at 647–49 (looking to plain, natural, and ordinary meaning of statutory terms). Based on these definitions, it is not necessary to show a deprivation was permanent to establish a "taking" or "appropriation" occurred. *See id.* Here, Defendants charged Plaintiffs monthly fees and had control over the invested funds for over two years. SAC ¶¶ 36-38 & n.5. Accordingly, when Defendants transferred Plaintiffs' assets into their own possession and exercised control for an extended amount of time, including under circumstances allowing them to acquire significant economic value or benefit of the assets, a "tak[ing] or appropriate[ion]" occurred. *See Adelsperger*, 373 Or. at 649–50. Defendants do not offer any precedent supporting their conclusion that, because they since refunded the disputed fee after the filing of this case, a taking did not occur, and the Court makes no finding as to damages at this time. *See* Defs.' Mot. 7.

Because Plaintiffs sufficiently allege facts to suggest Defendants took or appropriated their property, the Court denies Defendants' Motion on this basis.

## **CONCLUSION**

Plaintiffs bring their financial elder abuse claim according to two distinct theories under Or. Rev. Stat. § 124.100(4)–(5), and Or. Rev. Stat. § 124.110(1)(a). Because Plaintiffs' allegations do not plausibly establish Defendants permitted wrongful conduct against Plaintiff Machado, Defendants' Motion to Dismiss is GRANTED IN PART as to Plaintiffs' claim based on indirect

financial abuse. Defendants' Motion is DENIED IN PART as to Plaintiffs' claim based on direct financial abuse.

    IT IS SO ORDERED.

    DATED this 22nd day of December 2025.

                                                                _____/s Michael McShane_____
                                                                         Michael J. McShane
                                                            United States District Judge